**20-1955-cv**
*United States v. Bedi*

# In the
# United States Court of Appeals
## For the Second Circuit

————

AUGUST TERM 2020

ARGUED: MAY 20, 2021
DECIDED: SEPTEMBER 30, 2021

No. 20-1955-cv

UNITED STATES OF AMERICA,
*Plaintiff – Counter-Defendant – Appellee,*

*v.*

VICKRAM BEDI and DATALINK COMPUTER PRODUCTS, INC.,
*Defendants – Counter-Claimants – Appellants.*[*]

————

Appeal from the United States District Court
for the Northern District of New York

————

Before: WALKER, CABRANES, and WESLEY, *Circuit Judges.*

————

Datalink Computer Products, Inc. (Datalink) and its president, Vickram Bedi, appeal from a judgment of the Northern District of

---

[*] The Clerk of Court is directed to amend the caption as set forth above.

New York (Hurd, *J.*) granting summary judgment to the Government on its claim to collect approximately $341,000 in back wages on behalf of Helga Ingvarsdóttir, a native of Iceland and former Datalink employee. The back wages were owing to Ingvarsdóttir under federal law governing the H-1B visa program, which requires employers to pay H-1B workers no less than the "prevailing" or "actual" wage in their area of employment. After Bedi and Datalink refused to comply with an order from the U.S. Department of Labor (DOL) to remit the wages, the Government brought this action to collect the unpaid wages under the Federal Debt Collection Procedures Act (FDCPA), 28 U.S.C. § 3001 *et seq.*

On appeal, Bedi and Datalink principally argue that the Government may not use the procedures of the FDCPA to collect the unpaid wages. They contend that an administrative award of back wages is not an amount "owing to the United States" under the FDCPA, and that our circuit's contrary decision in *NLRB v. E.D.P. Medical Computer Systems, Inc.*, 6 F.3d 951 (2d Cir. 1993), should be reconsidered. For the reasons that follow, we agree. We hold that the Government may not rely on the FDCPA to collect back wages on Ingvarsdóttir's behalf. We therefore REVERSE the judgment of the district court, overrule *E.D.P.*, and restore the reach of the FDCPA to the limits enacted by Congress.

———

JESSE Z. GRAUMAN, Senior Attorney (Stanley E. Keen, Deputy Solicitor for National Operations, Jennifer S. Brand, Associate Solicitor, Rachel Goldberg, Counsel for Appellate Litigation, *on the brief*), United States Department of Labor, Washington, District of Columbia, *for Plaintiff – Counter-Defendant – Appellee United States of America*.

ALAN LEWIS (Leonardo Trivigno, *on the brief*), Carter Ledyard & Milburn LLP, New York, New York, *for Defendants – Counter-Claimants – Appellants Vickram Bedi and Datalink Computer Products, Inc.*

————

JOHN M. WALKER, JR., *Circuit Judge*:

Datalink Computer Products, Inc. (Datalink) and its president, Vickram Bedi, appeal from a judgment of the Northern District of New York (Hurd, *J.*) granting summary judgment to the Government on its claim to collect approximately $341,000 in back wages on behalf of Helga Ingvarsdóttir, a native of Iceland and former Datalink employee. The back wages were owing to Ingvarsdóttir under federal law governing the H-1B visa program, which requires employers to pay H-1B workers no less than the "prevailing" or "actual" wage in their area of employment. After Bedi and Datalink refused to comply with an order from the U.S. Department of Labor (DOL) to remit the wages, the Government brought this action to collect the unpaid wages under the Federal Debt Collection Procedures Act (FDCPA).[1]

On appeal, Bedi and Datalink principally argue that the Government may not use the procedures of the FDCPA to collect the unpaid wages. They contend that an administrative award of back wages is not an amount "owing to the United States" under the FDCPA, and that our circuit's contrary decision in *NLRB v. E.D.P. Medical Computer Systems, Inc.*[2] should be reconsidered. For the reasons that follow, we agree. We hold that the Government may not rely on the FDCPA to collect back wages on Ingvarsdóttir's behalf. We therefore REVERSE the judgment of the district court, overrule

---

[1] *See* 28 U.S.C. § 3001 *et seq.*

[2] 6 F.3d 951 (2d Cir. 1993).

*E.D.P.*, and restore the reach of the FDCPA to the limits enacted by Congress.[3]

## BACKGROUND

This appeal turns on a question of statutory interpretation: whether the FDCPA authorizes the United States to collect on an administrative order requiring a private employer to remit back pay to its former employee. While this question is a purely legal one, we begin with a brief discussion of the facts and procedural history to explain how this dispute originated.

From 1995 to 2010, Bedi was the president and sole shareholder of Datalink, a small company that sold and serviced computers. In 2005, Bedi sought to hire an employee through the H-1B visa program to speak with customers and to handle administrative work. The H-1B visa program allows U.S. employers to bring temporary workers to the United States to perform "specialty occupation[s]."[4] To participate in the program, employers must comply with certain labor standards, including by paying H-1B workers no less than the "actual" or "prevailing" wage in their area of employment.[5] In this case, Bedi obtained approval from the Department of Homeland Security to hire Ingvarsdóttir, a native of Iceland. In doing so, he

---

[3] This opinion has been circulated to all active judges of the court prior to filing.

[4] *See* 8 U.S.C. § 1101(a)(15)(H)(i)(b).

[5] Specifically, the H-1B visa program requires participating employers to pay workers the greater of (a) "the actual wage level paid by the employer to all other individuals with similar experience and qualifications for the specific employment in question," or (b) "the prevailing wage level for the occupational classification in the area of employment." *Id.* § 1182(n)(1)(A)(i)(I), (II).

certified to the DOL that he would pay her no less than the prevailing wage of $61,152 per year to work as an "Account Executive."

Ingvarsdóttir's employment with Datalink did not go smoothly. According to Ingvarsdóttir, Bedi abused and manipulated her, paid her only "sporadic[ally]," and forced her to perform "continuous servant work" for him and his mother.[6] The two also engaged in criminal activity. In November 2010, Bedi and Ingvarsdóttir were arrested and charged in New York State court in connection with an elaborate scheme to defraud one of Datalink's clients, Roger Davidson. Bedi pled guilty to first-degree grand larceny and was sentenced to three to nine years' imprisonment. Ingvarsdóttir pled guilty to second-degree grand larceny and was sentenced to five years' probation.

In March 2012, while Bedi and Ingvarsdóttir's criminal proceedings were pending, Ingvarsdóttir filed a complaint with the DOL's Wage and Hour Division alleging that she "receiv[ed] virtually no wages" from Datalink for her work from 2005 to 2010.[7] The DOL has authority to determine whether an H-1B employer has failed to pay wages as required by the H-1B visa program.[8] Pursuant to that authority, the agency issued a written determination on August 6, 2012, finding that Bedi and Datalink failed to pay Ingvarsdóttir $237,066.06 in wages required by the H-1B statute and regulations. The determination ordered them to pay the required back wages within 15 days, unless either party requested a hearing before an administrative law judge (ALJ).

Following the DOL's August 6 determination, Bedi and Ingvarsdóttir both requested hearings before an ALJ. The ALJ held

---

[6] Supp. App. at 24–25, 32–33.

[7] Supp. App. at 119.

[8] *See* 20 C.F.R. §§ 655.705(a)(2), 655.805(a)(2).

two hearings in the summer of 2013 and received post-hearing briefing from the parties. On August 4, 2014, the ALJ issued a final written decision holding Bedi and Datalink jointly and severally liable to Ingvarsdóttir for $341,693.03 in back wages, plus pre- and post-judgment interest (the Administrative Order).[9] Although Bedi and Datalink appealed to the Administrative Review Board (ARB), the ARB substantially affirmed the Administrative Order on February 29, 2016.[10]

Bedi and Datalink failed to comply with the Administrative Order and did not remit back wages to Ingvarsdóttir. Ingvarsdóttir sought to collect on the debt in state court, but her action was dismissed because she failed to establish that the court could grant her that relief.[11] Shortly thereafter, the Government initiated this action to collect the back wages under the FDCPA. As relevant here, the FDCPA authorizes the Government to recover judgment on a "debt," which the law defines as "an amount that is owing to the United States" on account of several enumerated "source[s] of indebtedness to the United States."[12] Although the text of the Administrative Order awarded back wages to "Ingvarsdottir," not "the United States," the Government claimed that the unpaid sum fell within the definition of "debt" such that the Government could collect the wages on Ingvarsdóttir's behalf.

On January 29, 2018, Bedi and Datalink moved to dismiss the

---

[9] The Administrative Order states: "IT IS ORDERED that . . . Datalink and Vickram Bedi pay Complainant Helga Ingvarsdottir $341,693.03 in back wages." Joint App. at 119.

[10] The ARB reduced the award of back wages from $341,693.03 to $340,987.43 to account for three days in 2006 when Ingvarsdóttir was unable to work.

[11] *See Ingvarsdóttir v. Bedi*, No. 155571/2016, 2017 WL 1438265, at *3–4 (N.Y. Sup. Ct., N.Y. Cnty. Apr. 24, 2017).

[12] 28 U.S.C. § 3002(3)(B).

Government's complaint, arguing that the agency's award of back wages was not "owing to the United States" as required by the plain text of the FDCPA.[13]  The district court denied the motion.  Relying on our prior decision in *E.D.P.*, it explained that a federal agency's award of back wages may qualify as a debt "owing to the United States" when the agency "act[s] 'in the overall public interest' of preventing unfair labor practices."[14]  While the district court acknowledged that *E.D.P.* was a split-panel decision and that other circuits have ruled to the contrary, it determined that it was bound by *E.D.P.*, which remained "the law of the Second Circuit."[15]

On December 13, 2019, when the parties moved for summary judgment, Bedi and Datalink renewed their argument that Ingvarsdóttir's back wages were not "owing to the United States" under the FDCPA.  The district court again rejected the argument, reiterating its prior conclusion "that the Second Circuit's decision in *E.D.P.* permitted the Government to use the FDCPA to pursue the back pay awarded to Ingvarsdóttir."[16]  After disposing of Bedi and Datalink's remaining arguments, the district court entered judgment in favor of the Government.[17]  Bedi and Datalink timely appealed.

---

[13] *See id.* § 3002(3)(A), (B).

[14] *See United States v. Bedi* (*Bedi I*), 318 F. Supp. 3d 561, 567 (N.D.N.Y. 2018) (quoting *E.D.P.*, 6 F.3d at 954).

[15] *Id.* at 567 & n.6.  Bedi and Datalink moved to certify the 2018 opinion for interlocutory appeal under 28 U.S.C. § 1292(b).  The district court denied the motion on January 28, 2019, concluding that "the controlling law of this Circuit is not fundamentally uncertain but simply unfavorable to defendants."  *United States v. Bedi* (*Bedi II*), No. 17cv1168, 2019 WL 356546, at *4 (N.D.N.Y. Jan. 28, 2019).

[16] *United States v. Bedi* (*Bedi III*), 453 F. Supp. 3d 563, 567 (N.D.N.Y. 2020).

[17] *Id.* at 574.

## DISCUSSION

We review a district court's decision granting summary judgment de novo, drawing all inferences in favor of the nonmoving party.[18] Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[19] The interpretation of a statute is a question of law, which we review de novo.[20]

On appeal, Bedi and Datalink argue that the district court erred in granting summary judgment to the Government because the Administrative Order awarding back wages was not a debt "owing to the United States" as required by the FDCPA.[21] They urge us to overrule *E.D.P.* as contrary to the plain meaning of the statute and as inconsistent with the decisions of our sister circuits and the Supreme Court. In the alternative, Bedi and Datalink contend that, even if the FDCPA could apply to the Administrative Order, the district court erred by rejecting their affirmative defense of *in pari delicto*.[22]

Reviewing the district court's decision de novo, we agree that the FDCPA does not authorize the Government to collect on the Administrative Order and conclude that *E.D.P.* was wrongly decided. Accordingly, without objection by the active judges of the Second Circuit, we overrule the majority opinion in *E.D.P.* and, in so doing, restore the reach of the FDCPA to the limits enacted by Congress.

---

[18] *Fischer v. Forrest*, 968 F.3d 216, 219 (2d Cir. 2020).

[19] Fed. R. Civ. P. 56(a).

[20] *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006).

[21] *See* 28 U.S.C. § 3002(3)(A), (B).

[22] "The doctrine of *in pari delicto*, a term meaning 'of equal fault,' reflects the principle that a plaintiff who has participated in wrongdoing equally with another person may not recover from that other person damages resulting from the wrongdoing." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 160 (2d Cir. 2014).

Because our interpretation of the statute resolves this appeal, we decline to address Bedi and Datalink's affirmative defense of *in pari delicto*.

When resolving a dispute over a statute's meaning, our principal task is "to afford the law's terms their ordinary meaning at the time Congress adopted them."[23]  When the statutory text is plain and unambiguous, our "sole function" is "to enforce it according to its terms."[24]   "Extrinsic materials have a role in statutory interpretation only to the extent they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms."[25]   After all, "[i]f judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives."[26] We thus begin with the statutory text, exhausting "all the textual and structural clues" bearing on its meaning[27] and construing each word "in its context and in light of the terms surrounding it."[28]

The FDCPA "provides the exclusive civil procedures for the United States to recover a judgment on a debt."[29]  The statute applies

---

[23] *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021).

[24] *See Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (quoting *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000)); *see also BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("[O]ur inquiry begins with the statutory text, and ends there as well if the text is unambiguous.").

[25] *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

[26] *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020).

[27] *Wisc. Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2074 (2018).

[28] *Leocal v. Ashcroft*, 543 U.S. 1, 9 (2004).

[29] 28 U.S.C. § 3001(a)(1).

only to an amount qualifying as a "debt,"[30] which it defines in two
subparts:

> (A)   an amount that is owing to the United States on
> account of a direct loan, or loan insured or guaranteed,
> by the United States; or
>
> (B)   an amount that is owing to the United States on
> account of a fee, duty, lease, rent, service, sale of real or
> personal property, overpayment, fine, assessment,
> penalty, restitution, damages, interest, tax, bail bond
> forfeiture, reimbursement, recovery of a cost incurred by
> the United States, or other source of indebtedness to the
> United States, but that is not owing under the terms of a
> contract originally entered into by only persons other
> than the United States[.][31]

Because our decision turns on the scope of the FDCPA's definition of
"debt," these two subparts are the focus of our analysis.

The text and structure of these provisions lead us to identify
both a primary requirement and a limitation to the definition of
"debt."   First, to qualify as a "debt," the amount must always be
"owing to the United States."[32]  This primary requirement is present
at the beginning of both subparts (A) and (B), and it carries through
each of the twists and turns in the ensuing statutory text.   The
language that follows the phrases "on account of" describes
permissible *sources* of indebtedness but does not modify the prior

---

[30] *See id.* § 3001(c) ("This chapter shall not apply with respect to an
amount owing that is not a debt or to a claim for an amount owing that is
not a debt.").

[31] *Id.* § 3002(3)(A), (B).

[32] *Id.*

condition requiring the debt to be "owing to the United States."[33] Thus, the Government may not use the FDCPA to collect *any* "fee," "rent," or "damages" owing to *anyone*.[34]  Only when such amounts are owing to the "United States" may the statutory authority apply.[35] Second, while this primary requirement is a necessary condition, a limitation in subpart (B) provides that it is not always sufficient.  Even if the debt is "owing to the United States" on account of a permissible source, the Government may not collect under subpart (B) of the FDCPA if the amount is "owing under the terms of a contract originally entered into by only persons other than the United States."[36]

We next consider the ordinary meaning of the phrase "owing to the United States" and its subsequent limitation in subpart (B).  In the context of the provisions here, a reasonable reader would understand the phrase "owing to the United States" to place the United States in the position of a creditor seeking to recover a debt.[37] In other words, the ordinary meaning of this phrase requires the United States to be the holder of the debt—i.e., the one "to whom [the] debt is owing"[38]—such that it has a direct financial stake in the debt

---

[33] *Id.*

[34] *See id.* § 3002(3)(B).

[35] The statute defines "United States" as:

    (A) a Federal corporation;

    (B) an agency, department, commission, board, or other entity of the United States; or

    (C) an instrumentality of the United States.

*Id.* § 3002(15).

[36] *Id.* § 3002(3)(B).

[37] *See FHFA v. UBS Ams. Inc.*, 712 F.3d 136, 141 (2d Cir. 2013) ("We must attempt to ascertain how a reasonable reader would understand the statutory text, considered as a whole." (internal quotation marks omitted)).

[38] *See Creditor*, Black's Law Dictionary (6th ed. 1990) (in circulation at time of FDCPA's enactment in 1990).

itself.  This interpretation flows not only from the plain meaning of the words "owing"[39]   and "indebtedness"[40] but also from other textual clues embedded in the definition.[41]  For example, the sources of indebtedness identified in subparts (A) and (B) reflect circumstances in which the federal treasury holds a direct financial interest in recovering the sum.  That is true regardless of whether the Government holds the debt in its capacity as sovereign (e.g., with respect to a "duty," "fine," or "tax") or as a party to a business or financial transaction (e.g., with respect to a "loan," "rent," or "sale of . . . property").[42]  The scope of the limitation in subpart (B) is plain as well.  As the Fifth Circuit explained in *Sobranes Recovery Pool I, LLC v. Todd & Hughes Construction Corp.*, the limitation simply "pulls out from the definition those amounts owing to the United States that find their genesis in contracts where the United States was not an original party."[43]

Applying the ordinary meaning of the statute to the question presented, we are unable to conclude that the DOL's award of back wages to Ingvarsdóttir created an indebtedness "owing to the United States."  Ingvarsdóttir, not the United States, was deprived of fair wages during the term of her employment, and the Administrative Order requires Bedi and Datalink to pay "Ingvarsdóttir," not "the

---

[39] *See* Merriam-Webster's Collegiate Dictionary (9th ed. 1989) (defining "owe" as "to be under obligation to pay" or "to be indebted to").

[40] *See id.* (defining "indebtedness" as "something (as an amount of money) that is owed").

[41] *See Leocal*, 543 U.S. at 9 ("[W]e construe language in its context and in light of the terms surrounding it.").

[42] *See* 28 U.S.C. § 3002(3)(A), (B).

[43] 509 F.3d 216, 223 (5th Cir. 2007) (discussing the limitation in subpart (B) of 28 U.S.C. § 3002(3)).

United States."[44]   As these facts make clear, the Government has no claim to the debt itself.   Any wages it collects will be remitted to Ingvarsdóttir, the only party to whom the debt is owing.

The Government argues that Bedi and Datalink's debt is "owing to the United States" because the Government's collection efforts preserve fair wages in the United States and vindicate the broader interests of the American public.   It further argues that the limitation in subpart (B) presents no barrier to collection because Bedi and Datalink's debt derives from federal regulations rather than any employment agreement that Ingvarsdóttir may have signed.   We do not dispute the premise of either argument:   the Government may serve the public interest when it acts as a vehicle for Ingvarsdóttir to collect the wages she is due, and federal law requires H-1B employers to pay the required wage regardless of whether the employee signs an agreement accepting lower compensation.[45]   But neither of these facts transform the *debt itself* into one that is "owing to the United States," which is the statute's primary requirement.[46]   Thus, while we acknowledge the Government's strong interest in promoting compliance with the H-1B visa program, we conclude that the Government may not use the procedures of the FDCPA to collect the Administrative Order on Ingvarsdóttir's behalf.

Although the text is unambiguous, our conclusion is fortified by the legislative history.   As the House report makes clear, the FDCPA was intended to address the growing problem of delinquent debt owing to the United States, in great measure due to high rates of

---

[44] As noted above, the Administrative Order requires "that . . . Datalink and Vickram Bedi pay Complainant Helga Ingvarsdottir $341,693.03 in back wages."  Joint App. at 119.

[45] *See* 8 U.S.C. § 1182(n)(1)(A)(i) (requiring employer to certify that it will pay the required wage).

[46] *See* 28 U.S.C. § 3002(3)(A), (B).

default in various government loan programs.[47]   In describing the purpose and structure of the bill, the House report refers only to "debts owed to the United States government," "Federal debts," and "government-owned debts," emphasizing that the goal of the FDCPA was to "lessen[] the effect of delinquent debts on the massive federal budget deficit [then] undermining the economic well-being of the Nation."[48]  As the First Circuit explained in *United States v. Bongiorno*, the procedural tools granted to the Government through the FDCPA serve the legislative purpose "when [they] operate[] in regard to a debt whose recovery will directly augment the public coffers."[49]  Put differently, Congress intended the FDCPA to apply to only those debts "in which the government has a direct pecuniary stake."[50]

The Government gives short shrift to this abundant historical evidence.  It argues that, while the FDCPA certainly applies to debts that "fill the public coffers," we should also consider the importance of effective collection for the enforcement of federal labor laws.[51] According to the Government, "Congress surely did not intend to have DOL go through years of investigations, administrative hearings, and appellate review leading to final agency action to enforce a federal labor law, only to have enforcement of its own order . . . be left to the disparate collection regimes that the FDCPA was specifically enacted to avoid."[52]  Again, the Government's argument misses the mark.  Nothing in the legislative history indicates that Congress enacted the FDCPA to aid in the enforcement of federal labor laws or to promote compliance with other obligations that are

---

[47] *See* H.R. Rep. No. 101-736, at 23–25 (1990), *reprinted in* 1990 U.S.C.C.A.N. 6472, 6631–33.

[48] *Id.*

[49] 106 F.3d 1027, 1039 (1st Cir. 1997).

[50] *Id.* at 1037.

[51] Appellee's Br. at 35–36 (citing *E.D.P.*, 6 F.3d at 955).

[52] *Id.* at 38.

regulated by the Government but owed to private parties. While these could have been valid objectives of Congress, it is not the job of judges to effectively rewrite the statute to achieve them.[53]

Our decision also accords with an analogous decision of the Supreme Court. Nearly seventy years ago in *Nathanson v. NLRB*, the Supreme Court held that an award of back pay by the National Labor Relations Board (NLRB) was not a "debt owing [to] the United States" under the Bankruptcy Act.[54] The Court explained that, while the Bankruptcy Act allowed the NLRB to file a claim for the back pay "as agent for the injured employees," it did not follow that any debt owed was entitled to priority as a debt "owing [to] the United States."[55] The Court emphasized that any funds collected would not flow to the federal treasury, but rather to "wage claimants who were discriminated against by their employer."[56] And although the Government tries to distinguish *Nathanson*, its analysis is unpersuasive. The bankruptcy provisions addressed in *Nathanson* parallel the FDCPA in terms of both their text and the legislative purpose that Congress sought to achieve.[57]

Despite the plain meaning of the statute, its legislative history, and the Supreme Court's guidance in *Nathanson*, the Government has one last argument: in *E.D.P.*, a split panel of our court held that the Government could rely on the FDCPA to collect an NLRB award of

---

[53] *See Bostock*, 140 S. Ct. at 1738.

[54] 344 U.S. 25, 27 (1952) (construing 11 U.S.C. § 104(a) (West Supp. 1952) (repealed 1978), which prioritized "debts owing to . . . the United States").

[55] *Id.*

[56] *Id.* at 28.

[57] *See id.* at 27–28 (explaining that "[t]he priority granted by [the Bankruptcy Act] was designed to secure an adequate public revenue to sustain the public burthens and discharge the public debts" (internal quotation marks omitted)).

back pay owing to a private employee.[58]  Applying that decision here, the Government argues that it may also collect the DOL's award of back wages notwithstanding the fact that the wages are ultimately owing to Ingvarsdóttir.

We reject the Government's argument because *E.D.P.* was wrongly decided.  Shirking both the statutory text and the weight of the legislative history, the majority in *E.D.P.* structured its opinion around a single sentence in a statement offered by Congressman Brooks, one of the bill's sponsors in the House.  Specifically, the majority seized on the Congressman's pronouncement that the FDCPA "will not apply to obligations which begin as purely private loan or contract obligations."[59]  From this, the majority reasoned that, if an obligation is not "purely private," it must fall within the reach of the FDCPA.[60]  In other words, the majority construed the Congressman's statement as delineating the *only* condition required for the FDCPA to apply without according any significance to the primary requirement in the statutory text:  that the debt to be enforced must be "owing to the United States."[61]

Even if we were to set aside the plain text of the statute (which undoubtedly we must not do), the Congressman's statement simply cannot bear the weight the majority opinion assigned to it.  In his full statement on the House floor, the Congressman explained that "[t]he definition of 'debt' was carefully written to make clear that the [A]ct

---

[58] *E.D.P.*, 6 F.3d at 954–55.

[59] *Id.* at 954 (quoting 136 Cong. Rec. H13288 (daily ed. Oct. 27, 1990) (statement by Congressman Brooks)).

[60] *See id.* at 955.

[61] *See* 28 U.S.C. § 3002(3)(A), (B).

will not apply to obligations which begin as purely private loan or contract obligations."[62]  He then provided an example:

> [I]f one of our constituents goes to his neighborhood bank or thrift and takes out a business or personal loan, that transaction is between him and the bank or thrift. . . . This is true even if the bank or thrift later fails and is taken over by Federal regulators. If the Federal Government seeks to recover these loan or contract obligations, it may do so in exactly the way it proceeded in the past; it is not eligible to use the new procedures in this [A]ct.[63]

Viewed in context, it seems clear that Congressman Brooks was addressing nothing more than the limitation in subpart (B), which simply "pulls out from the definition those amounts owing to the United States that find their genesis in contracts where the United States was not an original party."[64]  There is no evidence that the Congressman believed that the limitation dispensed with the primary requirement that all debts must be "owing to the United States" for the FDCPA to apply.  Even if that result were the unstated aim of his remarks, the Congressman could not achieve on the House floor what he failed to attain in the text itself.  "After all, only the words on the page constitute the law adopted by Congress and approved by the President."[65]

---

[62] 136 Cong. Rec. H13288 (daily ed. Oct. 27, 1990).

[63] *Id.*

[64] *Sobranes*, 509 F.3d at 223.

[65] *Bostock*, 140 S. Ct. at 1738.

Moreover, while *E.D.P.* has only once been cited within our circuit for the relevant proposition,[66] two of our sister circuits have expressly rejected *E.D.P.*, creating a circuit split in need of remediation.  In *Bongiorno*, the First Circuit held that the Government could not use the FDCPA to collect unpaid child support ordered as restitution in a criminal case.[67]  While collection of the debt would promote the public interest, the court emphasized that the Government "[was] not the holder of the debt in any legally cognizable sense" because it sought "to collect restitution not to its own behoof but for the benefit of a private party."[68]  Looking to the statutory text, the legislative purpose, and the Supreme Court's decision in *Nathanson*, the court rejected the majority opinion in *E.D.P.*, concluding that a debt does not come within the FDCPA's grasp "if the United States is neither the formal owner nor the direct beneficiary of it."[69]

The Fifth Circuit endorsed a similar construction of the FDCPA in *Sobranes*, holding that the Government could not rely on the Act to

---

[66] *See NLRB v. Kadouri Int'l Foods, Inc.*, No. 13mc0251, 2013 WL 3893330, at *3 (E.D.N.Y. July 24, 2013) (adopting the report and recommendation of the magistrate judge).  This single citation to *E.D.P.* illustrates that there are virtually no reliance interests that would weigh against overruling *E.D.P.*

[67] 106 F.3d at 1036.  As the First Circuit explained in *United States v. Witham*, Congress remedied this deficiency by passing the Mandatory Victims Restitution Act (MVRA), which expressly authorized the Government to use the procedures of the FDCPA to enforce private-victim restitution orders in criminal cases.  648 F.3d 40, 44–48 (1st Cir. 2011); *see also United States v. Mays*, 430 F.3d 963, 965 (9th Cir. 2005) (same); *United States v. Phillips*, 303 F.3d 548, 551 (5th Cir. 2002) (same).  While we agree that Congress may expand the reach of the FDCPA through separate statutory enactments, Congress has not provided the Government with any separate authority to use the procedures of the FDCPA to collect an administrative award of back pay like the one at issue here.

[68] *Bongiorno*, 106 F.3d at 1039.

[69] *Id.* at 1037.

collect an FDIC judgment because the underlying notes were "originally entered into by only persons other than the United States."[70]  As in *Bongiorno*, the panel refused to follow *E.D.P.*  The court observed that *E.D.P.*'s "textual analysis is brief at best and spends nary a word on the limiting clause in [subpart (B)] . . . . Looking past the text saps persuasive force from the majority's opinion."[71]  The compelling analyses in *Bongiorno* and *Sobranes* give us yet another reason to abandon *E.D.P.*

Of course, we recognize that *E.D.P.* is controlling precedent, and we readily acknowledge that a panel of our court is ordinarily "bound by the decisions of prior panels until such time as they are overruled either by an *en banc* panel of our Court or by the Supreme Court."[72]  In this case, however, we have circulated our opinion to all active judges of the court prior to filing and received no objection.[73]  And, "[w]hile *stare decisis* is undoubtedly of considerable importance to questions of statutory interpretation, the Supreme Court 'ha[s] never applied *stare decisis* mechanically to prohibit overruling . . . earlier decisions determining the meaning of statutes.'"[74]  Our principal duty, we believe, is to faithfully interpret the law Congress enacted.[75]  Accordingly, we overrule *E.D.P.* as wrongly decided and inconsistent with the ordinary meaning of the FDCPA.

---

[70] 509 F.3d at 221–24 (quoting 28 U.S.C. § 3002(3)(B)).

[71] *Id.* at 226.

[72] *In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010) (quoting *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004)).

[73] *See, e.g., Shipping Corp. of. India Ltd. v. Jaldhi Overseas Pte Ltd.*, 585 F.3d 58, 67 & n.9 (2d Cir. 2009) (reversing prior panel holding through notice to all active judges).

[74] *Shi Liang Lin v. U.S. Dep't of Justice*, 494 F.3d 296, 310 (2d Cir. 2007) (en banc) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 695 (1978)).

[75] *See Bostock*, 140 S. Ct. at 1738.

**CONCLUSION**

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND with instructions to enter judgment in favor of Bedi and Datalink.