UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

March Term, 2024

(Argued:  March 8, 2024          Decided:  November 25, 2025)

Docket No. 23-262

———————————————

CODY ZIPARO,
Plaintiff–Appellant,

v.

CSX TRANSPORTATION, INC.,
Defendant–Appellee,

———————————————

Before:        SACK, NARDINI, AND PÉREZ, *Circuit Judges*.

In this "whistleblower" action brought under the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109, Plaintiff-Appellant Cody Ziparo appeals from the district court's grant of summary judgment to Defendant-Appellee CSX Transportation Inc. ("CSX").

In early 2016, two of Ziparo's supervisors pressured Ziparo to falsely mark tasks as complete in CSX's internal on-board work order system.  Ziparo contends that he engaged in protected activity under the FRSA by reporting that the pressure from his supervisors to falsify this information was creating an unsafe working environment.  In response, CSX supervisors threatened to fire Ziparo for insubordination, repeatedly yelled at him, and subjected him to increased scrutiny.  In May 2016, Ziparo lodged a formal complaint with CSX.  About a month later, in an unrelated incident, Ziparo failed to move a train switch back to its proper place, which could have led to a catastrophic train derailment or collision.  CSX then terminated Ziparo's employment.

The district court granted summary judgment to CSX because, it concluded, Ziparo had failed to demonstrate that his protected activity was a

"contributing factor" in his termination and, alternatively, CSX had demonstrated by clear-and-convincing evidence that it would have terminated Ziparo even had he not engaged in protected activity.

On appeal, we first clarify the standards governing an FRSA whistleblower action. In *Murray v. UBS Securities, LLC*, 601 U.S. 23 (2024), the Supreme Court held that a plaintiff need not show that the employer acted with retaliatory intent, animus, or motive to meet the plaintiff's burden under the "contributing-factor" causation standard, *id.* at 34–35, and construed the contributing-factor standard as "broad" and "lenient" for plaintiffs, *id.* at 35, 37. Although *Murray* construed the anti-retaliation provision of the Sarbanes-Oxley Act ("SOX"), 18 U.S.C. § 1514A, both the FRSA and SOX incorporate the same causation standard and burden-shifting framework for whistleblower claims, meaning that *Murray*'s reasoning applies with equal force in FRSA cases. We therefore overrule our holding in *Tompkins v. Metro-North Commuter Railroad Co.*, 983 F.3d 74 (2d Cir. 2020), that an FRSA plaintiff must show evidence of the employer's retaliatory intent, animus, or motive and that evidence of temporal proximity between the employee's protected activity and the employer's adverse employment action is necessarily insufficient to present a genuine factual issue on retaliation, *id.* at 82.

On the merits of Ziparo's appeal, we conclude that the district court erred in granting CSX's motion for summary judgment. We first determine that a reasonable juror could find that CSX subjected Ziparo to a retaliatory hostile work environment before Ziparo lodged his formal complaint with CSX in May 2016. We further conclude that disputed issues of material fact preclude summary judgment on Ziparo's challenge to his termination: Ziparo has proffered sufficient evidence to permit a juror to find that his protected activity contributed to his termination, and, because of evidence that CSX did not consistently terminate employees who made similar errors as Ziparo, CSX has not demonstrated by clear and convincing evidence that it would have fired Ziparo in the absence of his protected activity. We therefore

VACATE the district court's judgment and REMAND for further proceedings consistent with this opinion.

> P. MATTHEW DARBY, Darby Law Group, LLC, Hunt Valley, MD, *for Plaintiff-Appellant Cody Ziparo;*

JOSEPH C. DEVINE, Baker & Hostetler, LLP, Columbus, OH (Susan Roney, Nixon Peabody, LLP, Buffalo, NY, *on the brief*), *for Defendant-Appellee CSX Transportation, Inc.*

SACK, *Circuit Judge*:

For over a decade, Cody Ziparo served as a freight train conductor at CSX Transportation, Inc. ("CSX"), a large national railroad carrier. In early 2016, Ziparo's supervisors began pressuring him to falsify records in CSX's internal on-board work order ("OBWO") system. When Ziparo refused to do so and complained that the pressure from their falsification requests was creating an unsafe working environment, those supervisors shouted at him and subjected him to additional scrutiny. On May 3, 2016, one supervisor threatened to fire Ziparo for insubordination. The next day, Ziparo filed a formal retaliation complaint with CSX's internal ethics department.

About a month later, on June 9, Ziparo made a potentially serious and apparently unrelated misstep. After using a train switch to shift trains between tracks, Ziparo failed to return the switch back to its original position. A train struck the switch, seriously damaging it; had the train been traveling in the opposite direction, it could have fully derailed. After an investigation and hearing, CSX terminated Ziparo's employment.

3

Ziparo sued CSX under the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109, in the United States District Court for the Northern District of New York, alleging that CSX unlawfully retaliated against him by first subjecting him to a retaliatory hostile work environment and then terminating his employment. The district court (Suddaby, *Judge*) granted CSX's motion for summary judgment, concluding that Ziparo had not engaged in protected activity. *Ziparo v. CSX Transportation, Inc. (Ziparo I)*, 443 F. Supp. 3d 276, 302 (N.D.N.Y. 2020). We reversed, however, holding that Ziparo had engaged in protected activity so long as he had a good faith belief that CSX's work-order falsification requests were creating an unsafe working environment. *Ziparo v. CSX Transportation, Inc. (Ziparo II)*, 15 F.4th 153, 165 (2d Cir. 2021). On remand, the district court again granted summary judgment for CSX, this time concluding that Ziparo had not engaged in protected activity before his two complaints in May 2016, that Ziparo had failed to demonstrate a causal connection between his protected activity and his ultimate termination, and, alternatively, that CSX was able to demonstrate by clear-and-convincing evidence that it would have fired Ziparo in the absence of his protected activity. *Ziparo v. CSX Transportation, Inc.*

4

*(Ziparo III)*, No. 17-CV-708, 2023 WL 2424599, at \*4–6 (N.D.N.Y. Jan. 31, 2023).

This second appeal followed.

We first clarify the proper standard governing Ziparo's FRSA claim. To show causation under the FRSA—that an adverse employment action happened "because" of legally protected activity—Ziparo must meet the "contributing-factor causation standard," meaning that his protected activity must be a factor that, alone or in combination with other factors, contributed to CSX's adverse actions. After the district court issued its decision and the parties filed their briefs in this appeal, the Supreme Court held in *Murray v. UBS Securities, LLC*, 601 U.S. 23 (2024), that to demonstrate contributing-factor causation, a whistleblower-plaintiff need not produce evidence of the employer's retaliatory intent, animus, or motive, *id.* at 34–35. *Murray* examined a whistleblower claim under the provision of the Sarbanes-Oxley Act of 2002 ("SOX") that prohibits retaliation at publicly traded companies, 18 U.S.C. § 1514A; because both the FRSA and SOX incorporate the same burden-shifting framework and contributing factor causation standard (the "AIR-21" burden-shifting

5

framework),[1] *Murray*'s reasoning binds us here with equal force. We therefore conclude that *Murray* requires us to overrule several of our conclusions about the FRSA's contributing-factor causation standard elaborated in *Tompkins v. Metro-North Commuter Railroad Co.*, 983 F.3d 74 (2d Cir. 2020).

In *Tompkins*, we held that to meet the contributing-factor standard, an FRSA plaintiff must show "some proof of retaliatory motive" and "evidence of intentional retaliation."[2] *Id.* at 82. We further stated that evidence of temporal proximity—the closeness in time between an employee's protected activity and the employer's adverse action—was necessarily insufficient to meet this burden. *Id.* In light of *Murray*, we now recognize that an employee need not demonstrate an employer's retaliatory motive, intent, or animus to meet their causation burden. Instead, an employee must only demonstrate, by a preponderance of the evidence, that their protected activity "contributed" to the employer's adverse employment action. *See* 49 U.S.C. § 20109(d)(2) (FRSA provision incorporating AIR-21); *id.* § 42121(b)(2)(B)(i) (AIR-21 provision stating that an employee must

---

[1] The framework takes its name from the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR-21"), 49 U.S.C. § 42121, which protects airline-industry employees from retaliation.

[2] Unless otherwise indicated, we omit all internal quotation marks, alteration marks, emphases, footnotes, and citations when quoting cases.

show that their protected activity "was a contributing factor in the unfavorable personnel action"). And an employee may do that with circumstantial evidence, including sufficiently close temporal proximity alone.

On the merits of Ziparo's appeal, we first determine that a reasonable juror could find that CSX subjected Ziparo to a retaliatory work environment before Ziparo lodged his formal ethics complaint. In reaching that conclusion, we decide that a retaliatory hostile work environment is a cognizable adverse employment action under the FRSA. As to Ziparo's challenge to his termination, the district court erred in granting CSX summary judgment. Under the "lenient" and "broad" contributing-factor causation standard articulated in *Murray*, 601 U.S. at 35, 37, we conclude that there are material factual disputes over whether Ziparo's protected activity contributed to his termination. Moreover, because of evidence that CSX did not terminate most employees who made similar errors to Ziparo's, a jury, rather than a court, must determine whether CSX has met its burden of demonstrating by clear-and-convincing evidence that it would have terminated Ziparo in the absence of his protected activity.

We therefore **VACATE** the district court's order granting CSX's motion for summary judgment and **REMAND** the matter for further proceedings consistent with this opinion.

## BACKGROUND

### I. Factual Background

We draw the following statement of facts from the evidence in the summary-judgment record, which we construe in the light most favorable to the non-movant, Ziparo. *See Cortez v. Forster & Garbus, LLP*, 999 F.3d 151, 153–54 (2d Cir. 2021). "To the extent that this opinion references facts contained in the sealed record, those portions of the record are unsealed." *Ziparo II*, 15 F.4th at 156.

Ziparo worked as a freight train conductor at CSX—one of the largest national providers of freight rail transportation—from 2006 until his termination on July 15, 2016. In that role, Ziparo was responsible for moving railcars onto their designated tracks. To do so, a conductor uses a lever to move the mainline rail switch; after a conductor switches a loaded railcar or removes an empty one, he returns the switch to its normal position and locks it. During the relevant time, Ziparo worked in Watertown, New York, under the supervision of trainmasters Ryan Van Blarcom and Jim Lacy and alongside engineer

Christopher Pigula. Lacy worked primarily in Watertown and Van Blarcom in Massena, New York.

In or around January 2016, as the volume of work increased for CSX employees, Van Blarcom and Lacy began ordering Ziparo to falsify records in CSX's OBWO system. Conductors like Ziparo are supposed to use CSX's OBWO system to record tasks, such as the placement of railcars, as they complete them. The OBWO system is not mandated by federal law, nor does it perform any safety-related purpose, but it provides valuable information to both CSX's customers as to the progress of orders and CSX itself as to the productivity of its employees. *Ziparo II*, 15 F.4th at 156–57. Because trainmasters are responsible for overseeing the work of conductors and other lower-level employees, they—but not conductors—receive bonuses tied to meeting performance goals measured by OBWO metrics. It is undisputed that Van Blarcom and Lacy pressured Ziparo and another conductor to inflate their performance metrics so that Van Blarcom and Lacy could win higher bonuses. *Id.* at 157. According to both Ziparo and Pigula, Van Blarcom pressured Ziparo to falsify the OBWOs on a near daily basis. *See* Joint App'x 549, 621.

Uncomfortable with falsifying the OBWOs, Ziparo refused to do so. In response, Van Blarcom and Lacy increased the pressure on Ziparo to falsify the OBWOs. Pigula recalled that shortly before April 2016, Van Blarcom began scrutinizing Ziparo and his work, including by driving an hour and forty-five minutes from Massena to Watertown to watch Ziparo switch railcars for almost seven hours a day—which Pigula characterized as an "unusual" occurrence.[3] *Id.* at 1318–19. According to Ziparo, the falsification demands and pressure were "taking a toll on [him]" and interfered with his job performance. *Id.* at 1291–92. Worried that he would "los[e] [his] job for doing the right thing," and shaking from the stress, Ziparo lost focus; communication between Ziparo and his coworkers also frayed. *Id.*; *see id.* at 1307 (Pigula testifying that Ziparo "would just absent-mindedly walk past things or fail to complete a routine task" in response to the pressure from his supervisors).

Both Ziparo and Pigula repeatedly complained to Van Blarcom and Lacy that their demands and scrutiny were creating an unsafe working environment.

---

[3] There is conflicting testimony on when Van Blarcom began driving to Watertown to scrutinize Ziparo's work. *Contrast* Joint App'x 549–50 (Ziparo testifying that "the hand brake [charge on April 13, 2016] was the start of it . . . . [A]fter that, [Van Blarcom] would watch us") *with id.* at 1318 (Pigula testifying that Van Blarcom began driving to Watertown before April 13, 2016). We discuss the handbrake incident on April 13, 2016, further below.

Ziparo recalled telling Van Blarcom and Lacy "multiple times that the environment that they're creating is unsafe." *Id.* at 1291–93. According to Pigula, Ziparo and he complained to Lacy "[o]n a daily basis, at least three days a week" that the falsification requests were "going to be a safety issue." *Id.* at 1308–09; *see also id.* at 764 (Van Blarcom testifying at deposition that Ziparo had told him he had issues with falsifying OBWOs before April 13, 2016).

On April 13, 2016, Van Blarcom brought a disciplinary charge against Ziparo for failure to apply a "handbrake test" on railcars when separating them from other cars on the train. According to Ziparo's and Pigula's deposition testimony, Van Blarcom selectively brought this charge against Ziparo. *See, e.g., id.* at 1285–87 (Ziparo contending that a handbrake test was unnecessary when a conductor is in the vicinity of the switching operations); *id.* at 1314, 1322–23 (Pigula testifying that the "general expectation" was to not perform a handbrake test and that Van Blarcom had not always disciplined employees for failing to perform the handbrake test; Van Blarcom appeared "happy" that he had caught Ziparo not performing the test). Lacy, who testified that he was unaware of other handbrake-related charges against employees, *id.* at 826, filed a declaration in this litigation stating that Van Blarcom told him that "when [Van Blarcom]

11

wanted to eliminate an employee, he would watch that employee," *id.* 848 ¶ 22.

If an employee committed a rules violation, Lacy continued, Van Blarcom would

not confront the employee immediately, allowing him to "witness as severe and

as many rule violations as possible[] so as to increase the disciplinary charges

against the employee"—a practice against CSX policy. *Id.* Ziparo ultimately

decided to accept responsibility for the violation so as not to receive any

punishment. *Id.* at 1284.

After the handbrake incident on April 13, the scrutiny escalated.

According to Ziparo, Van Blarcom demanded that Ziparo make a handwritten

list of everything he did "from start to finish" for a two-and-a-half week period.

*Id.* at 551; *see id.* at 1289, 1304–05. Then, each morning for "about an hour," Van

Blarcom called Ziparo to "ream" and "chew" him out for any incomplete

OBWOs, leaving Ziparo "shaking answering the phone" and "stressed to the

max, anxiety[-]ridden." *Id.* at 552. Van Blarcom probed Ziparo on the tasks that

Ziparo had completed and recorded in the handwritten list.

On April 29, 2016, Ziparo and his coworkers worked through their lunches

and breaks to finish an important task for a customer but were unable to finish

the rest of their work within their hours of service.[4]  Van Blarcom and Lacy nonetheless instructed Ziparo to mark the remaining work as complete "to conceal operational failures." *Id.* at 1390 (CSX's investigation).  But Ziparo refused, instead (correctly) marking the remaining work as "out of time" to reflect the fact that he could not complete all planned tasks during his shift.  *Id.* at 1392.

On May 3, 2016, Lacy called Ziparo into his office, began "screaming and yelling at [Ziparo]," and told him that Van Blarcom wanted to fire him for insubordination.  *Id.* at 555–56; *see id.* at 797, 812.  According to Lacy, Van Blarcom had directed him to tell Ziparo he would be charged with insubordination if he did not follow Van Blarcom's instructions.  Ziparo responded that he had "no other choice" because he was "not going to lie" by falsifying the OBWOs.  *Id.* at 556.  Ziparo again warned Lacy that he thought that these requests were creating a safety issue by causing him undue stress.  *Id.* at 224 (Lacy's testimony).  During that meeting, Lacy called another manager, who explained that Ziparo had correctly marked the work order as incomplete.  A

---

[4] As CSX's internal investigation noted, "[i]n accordance with federal law, train crews are limited to a specific amount of time that they can work continuously."  Joint App'x 1390.

subsequent internal CSX investigation confirmed that "Lacy was in fact going to file an assessment on Ziparo for insubordination[] because he did not follow [Lacy's] instructions [to] falsify OBWO records." *Id.* at 1392.

This incident was, according to Ziparo, the "last straw." *Id.* at 1282. The next day, both Ziparo and Pigula called CSX's ethics hotline to complain about the falsification requests. According to CSX's summary of the call, Ziparo conveyed to the ethics hotline his belief that the OBWO falsifications requests created a "safety issue because employees are not focused on their work and are preoccupied with the harassment coming from Jim [Lacy] and Ryan [Van Blarcom]." *Id.* at 1382. After interviewing Ziparo, "another conductor," Van Blarcom, and Lacy in connection with their investigation, CSX officials substantiated Ziparo's complaints that Van Blarcom and Lacy instructed Ziparo to falsify the OBWOs and that Lacy threatened to charge Ziparo with insubordination. *Id.* at 1388–92. CSX issued a disciplinary letter to Lacy and a written warning to Van Blarcom.

About a month later, on June 9, 2016, a southbound train caused serious damage to a misaligned track switch. Had a northbound train run over the misaligned switch, it might have been diverted off the main track and caused

14

significant damage, including possible injury and death to persons nearby.

When this case was before us on an earlier appeal, we explained that "CSX's reports show that Ziparo was the last person to operate the switch before the incident and that he failed to return the switch to the proper position after doing so," and there is "no evidence in the record that anyone else operated the switch at any point between when Ziparo did so and when the accident occurred, nor is there any evidence of tampering" by anyone else. *Ziparo II*, 15 F.4th at 157.

CSX investigated the matter, concluded that Ziparo was responsible for failing to return the mainline switch to its normal position, and suspended his conductor certification. On June 16, the company held an investigative hearing, where a union representative appeared for Ziparo and could cross-examine CSX's witnesses and call witnesses in his defense. Van Blarcom served as the charging officer presenting evidence against Ziparo, while Brian Murray served as the hearing officer. On July 15, Murray concluded that Ziparo was responsible for the incident, *id.*; that same day, Bill Setser, the Division Manager of CSX's Albany Division, fired Ziparo, Joint App'x 1130. This outcome was relatively unusual: Only six out of seventeen employees who had been charged with similar rule violations had been terminated. *See Ziparo I*, 443 F. Supp. 3d at 290.

## II.    Procedural History

A couple of weeks later, on August 2, 2016, Ziparo filed an FRSA whistleblower complaint with the U.S. Department of Labor ("DOL"). On June 29, 2017, after the DOL failed to render a final decision within 210 days, he sued CSX in the Northern District of New York. Ziparo alleged that CSX had violated the whistleblower-protection provision of the FRSA, 49 U.S.C. § 20109, by creating a retaliatory hostile work environment and, ultimately, by terminating his employment.

On March 9, 2020, the district court granted summary judgment for CSX, concluding that Ziparo had not engaged in protected activity. *See Ziparo I*, 443 F. Supp. 3d at 302. Determining that the FRSA's protected-activity requirement under § 20109(b)(1)(A) contained both objective and subjective reasonableness components, the court concluded that no reasonable jury could find it objectively reasonable for Ziparo to have believed that his own stress and distraction amounted to a "hazardous safety or security condition." *Id.* at 296–300.

On appeal, we reversed, concluding that a reasonable jury could find that Ziparo had engaged in protected activity. *See Ziparo II*, 15 F.4th at 165. Rejecting the district court's understanding that the FRSA includes an *objective* component,

16

we held that an employee engages in protected activity under the FRSA when he reports a condition that he *subjectively* believes raises safety concerns, so long as that belief is in good faith. *Id.* at 163–65. Thus, to the extent that Ziparo reported in good faith that the falsification requests were creating an unsafe working environment, Ziparo engaged in protected activity under the FRSA. *Id.* at 165–66. We declined CSX's invitation to affirm the district court's judgment on the alternative basis that "no reasonable jury could find that Ziparo was fired in part for his reports about Lacy and Van Blarcom rather than solely because of his negligence in failing to properly reset a switch" because the district court had not addressed this argument. *Id.* at 166.

On remand, the district court granted summary judgment to CSX for a second time. *See Ziparo III*, 2023 WL 2424599, at *7. The district court first found that Ziparo's protected activity consisted of "his twice complaining in good faith in early May 2016 about pressure he felt to do something that he subjectively believed to be a 'hazardous safety or security condition' (i.e., falsifying his OBWO)" and therefore did not consider whether Ziparo suffered an adverse employment action *before* May 2016. *Id.* at *4. As to Ziparo's challenge to his ultimate termination, the court concluded that Ziparo's protected activity, i.e.,

reporting the stress from the falsification requests, was not a contributing factor in his termination, *id.* at *5, and, in the alternative, that CSX "has demonstrated, by clear and convincing evidence, that it would have taken the unfavorable personnel action against Plaintiff in the absence of the protected activity," *id.* at *6. Ziparo timely appealed.[5]

After the parties filed their briefs, but before we heard oral argument on March 8, 2024, the Supreme Court issued its decision in *Murray*, 601 U.S. 23. After we decided *Murray* on remand,[6] *Murray v. UBS Sec., LLC*, 128 F.4th 363 (2d Cir. 2025), we directed the parties to file supplemental letter briefs to address whether *Murray* required us to overrule several of our conclusions in *Tompkins*.

---

[5] Ziparo argued in his brief that the district court erred in excluding the trial testimony of Ziparo's expert witness, *see* Appellant's Br. at 57–58, but at oral argument, he stated that he was abandoning this argument, *see* Oral Audio Recording, *Ziparo v. CSX Transportation, Inc.*, No. 23-262, at 21:53–23:30.

[6] On remand, we again vacated the district court's judgment entered on jury verdict finding the defendant-employer liable, this time concluding that the jury instructions impermissibly expanded the definition of a "contributing factor" and therefore the defendant's liability "beyond what the statute allows." *Murray*, 128 F.4th at 366.

# DISCUSSION

## I. Applicable Law

### A. *Standard of Review*

We review a district court's grant of summary judgment de novo. *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). On CSX's motion for summary judgment, we construe the evidence in the light most favorable to Ziparo, drawing all reasonable inferences in his favor. *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003). Only when "there is no genuine dispute as to any material fact" is "the movant [] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court's role in deciding a motion for summary judgment "is to identify factual issues, not to resolve them." *Jasco Tools, Inc. v. Dana Corp. (In re Dana Corp.)*, 574 F.3d 129, 156 (2d Cir. 2009).

### B. *The Federal Railroad Safety Act ("FRSA")*

The FRSA's stated purpose is "to promote safety in every area of railroad operations." 49 U.S.C. § 20101. Congress first enacted the statute in 1970, *see* Federal Railroad Safety Act of 1970, Pub. L. No. 91-458, 84 Stat. 971, *et seq.* (1970), and amended it in 1980 to prohibit retaliation against employees, *see* Federal Railroad Safety Authorization Act of 1980, Pub. L. No. 96-423, § 10, 94 Stat. 1811, 1815 (1980). However, the 1980 amendments channeled retaliation complaints through mandatory dispute resolution pursuant to the Railway Labor Act, 45

19

U.S.C. § 151 *et seq.* *See Araujo v. N.J. Transit Rail Ops., Inc.*, 708 F.3d 152, 156 (3d Cir. 2013) (discussing statutory history). In 2007, in an attempt to enhance "administrative and civil remedies for employees" and the "oversight measures that improve transparency and accountability of the railroad carriers," and to "ensure that employees can report their concerns without the fear of possible retaliation or discrimination from employers," H. R. Rep. No. 110–259 at 348 (2007) (Conf. Rep.), *as reprinted in* 2007 U.S.C.C.A.N. 119, 181, Congress amended the antiretaliation provision, "expanding the scope of [its] protections and providing enforcement authority with the Department of Labor," *Araujo*, 708 F.3d at 156. The provisions of the FRSA relevant to this appeal are substantially the same as they were under the 2007 amendments.

The FRSA's antiretaliation provision protects from retaliation three broad categories of employee activity, § 20109(a)–(c). The provision under which Ziparo brought his claim states that "[a] railroad carrier . . . shall not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee for . . . reporting, in good faith, a hazardous safety or security condition." 49 U.S.C. § 20109(b)(1)(A). Section 20109(d)—a provision that we

examine further below—provides the framework for FRSA "[e]nforcement actions."

Procedurally, an employee must first file their whistleblower complaint with the DOL's Occupational Safety and Health Administration ("OSHA"). *See* 49 U.S.C. § 20109(d)(1); 29 C.F.R. § 1982.104. If the employee states a prima facie case of retaliation, the OSHA Assistant Secretary will investigate and, "if there is reasonable cause to believe that a violation has occurred, issue a preliminary order granting relief." *Norfolk S. Ry. Co. v. Solis*, 915 F. Supp. 2d 32, 38 (D.D.C. 2013). The railroad or employee may file objections before an Administrative Law Judge ("ALJ"), whose decisions and recommendations are reviewed by the DOL's Administrative Review Board ("ARB"). *Id.* The ARB's final order is then subject to judicial review in a United States Court of Appeals. 49 U.S.C. § 20109(d)(4). If, however, the DOL has failed to issue a final decision within 210 days of the filing of an administrative complaint, and the delay is not due to the bad faith of the employee, the employee may bring an action in federal district court for "de novo review" of the complaint under the so-called "kickout" provision. *Id.* § 20109(d)(3).

21

**C.** ***Burden-Shifting Frameworks and Causation Standards in Whistleblower Law***

Before examining the precise framework governing Ziparo's FRSA claim, we provide background on causation standards and burden-shifting frameworks in whistleblower law. Because distinct burdens vary by statute, we must carefully delineate and apply the proper standard in this appeal.

In employment and whistleblower law, a plaintiff must meet a causation standard that dictates the link that the plaintiff must show between their protected activity and the adverse employment action that they suffered—e.g., that an employer fired them *because* of their whistleblowing. But not all causation standards are created equal.

Most familiar from blackletter tort law is the "ancient and simple 'but for' common law causation test" that, "but for the defendant's unlawful conduct, [the plaintiff's] alleged injury would not have occurred." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 331–32 (2020). This causation standard, the Supreme Court has held, is the "'default' or 'background' rule against which Congress is normally presumed to have legislated when creating its own new causes of action," *id.* at 332, and applies to various employment and antidiscrimination statutes, *see, e.g., id.* at 333 (holding that plaintiffs bringing 42

U.S.C. § 1981 claims alleging racial discrimination in contracts must show but-for causation); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346–47 (2013) (Title VII retaliation claims); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176–77 (2009) (Age Discrimination in Employment Act of 1967). Of course, but-for causation can be "a sweeping standard" because "[o]ften, events have multiple but-for causes." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 656 (2020).

But-for causation does not hold a monopoly on causation, though; by statute, Congress often supplies alternative standards. Some statutes employ a heightened causation burden, requiring, for instance, that a cause must be the "sole" or "primary" cause. *See id.* at 656–57 (citing statutes). Other statutes impose a lessened burden on plaintiffs: Title VII discrimination claims, for example, require a plaintiff to show that a protected trait was "a 'motivating factor' in a defendant's challenged employment practice," a "more forgiving standard" for plaintiffs since liability can follow even if the trait was not a but-for cause of the discrimination. *Bostock*, 590 U.S. at 657 (quoting 42 U.S.C. § 2000e–2(m); *see Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 87 (2d Cir. 2015) (framing the "motivating factor" test as whether the adverse action "was motivated at least in part by an impermissible reason"); *see also Gilead Cmty. Serv.*,

23

*Inc. v. Town of Cromwell*, 112 F.4th 93, 99 (2d Cir. 2024) (applying the motivating factor standard to certain discrimination claims brought under the federal Fair Housing Act). And relevant for our purposes, a family of federal whistleblower statutes employ the even more plaintiff-friendly "contributing-factor" causation standard.

A "contributing factor" is any factor that, alone or in combination with other factors, contributes in any way to the employer's decision to undertake an adverse employment action against the employee.[7] *Araujo*, 708 F.3d at 158. It is not enough for the factor to be the "sort of behavior that would tend to affect a termination decision." *Murray*, 128 F.4th at 369. Instead, the factor must have "an *actual* effect that *helps bring about a result*." *Id.* at 372. The standard originates in the protections for federal employees in the Whistleblower Protection Act of 1989, 5 U.S.C. § 1221(e), and was intended to overrule caselaw requiring a

---

[7] The definition of a "contributing factor" adopted by our sister circuits was "any factor, which alone or in combination with other factors, *tends to* affect in any way the outcome of the decision." *Araujo*, 708 F.3d at 158 (emphasis added); *see Murray*, 128 F.4th at 371 n.3 (collecting cases). We note that on remand in *Murray*, the panel majority held that this language in a jury instruction was erroneous and not "readily understood by laymen" because the causation standard "requires an *actual effect* that *helps bring about a result*." 128 F.4th at 371. The *Murray* Court did, however, suggest that this language might be proper for "use by judges," albeit not in jury instructions. *Id.*

whistleblower to show that "his protected conduct was a 'significant,' 'motivating,' 'substantial,' or 'predominant' factor in a personnel action . . . ." *Marano v. Dep't of Just.*, 2 F.3d 1137, 1140 (Fed. Cir. 1993) (quoting 135 Cong. Rec. 5033 (1989)).  This plaintiff-friendly causation burden, as the Supreme Court explained, expresses Congress's policy judgment that "personnel actions against employees should quite simply not be based on protected whistleblowing activities—not even a little bit." *Murray*, 601 U.S. at 36–37.  Congress subsequently incorporated this causation standard into "a series of similar whistleblower statutes that protect non-civil-service employees in industries where whistleblowing plays an especially important role in protecting the public welfare," such as in AIR-21 for the airline industry and SOX for publicly traded companies.  *Id.* at 28.

The appropriate causation standard often folds into a broader burden-shifting scheme.  Burden-shifting frameworks are used "to facilitate the orderly consideration of relevant evidence" and "progressively [] sharpen the inquiry into the elusive factual question of intentional discrimination."  *Id.* at 35–36. "Because discriminatory intent is difficult to prove, and because employers control most of the cards, burden shifting plays the necessary role of forcing the

defendant to come forward with some response to the employee's circumstantial evidence." *Id.* at 36.

AIR-21 furnishes a plaintiff-friendly, two-step burden-shifting framework. At step one, plaintiff must establish, by a preponderance of the evidence, that "(1) the plaintiff engaged in protected activity; (2) the employer knew that the plaintiff engaged in the protected activity; (3) the plaintiff suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action." *Ziparo II*, 15 F.4th at 158. Importantly, the plaintiff's causation burden is the more plaintiff-friendly contributing-factor standard. 49 U.S.C. § 42121(b)(2)(B)(i). If the plaintiff makes this showing at step one, the burden then shifts to the employer. *Id.* § 42121(b)(2)(B)(ii). Unlike other frameworks, however, the ultimate burden does not then shift back to the plaintiff under AIR-21—it remains with the employer.[8] At the second and final

---

[8] Perhaps the most familiar burden-shifting framework is the three-step burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). At step one under *McDonnell Douglas*, the plaintiff must establish a prima facie case of discrimination or retaliation, including the required causal link between the protected activity or trait and the adverse employment action; at step two, the burden shifts to the employer to articulate a legitimate, non-discriminatory or non-retaliatory reason for its policy and action; and at step three, the burden shifts back to the plaintiff to show, by a preponderance of the evidence, that the employer's justification is a pretext for discrimination or retaliation. *See, e.g.*, *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 107–08 (2d Cir.

step of AIR-21, the employer's burden is not merely to articulate some legitimate business reason for the employment action, but to prove, by clear and convincing evidence, "that the employer would have taken the same unfavorable personnel action in the absence of that behavior." 49 U.S.C. § 42121(b)(2)(B)(ii). As "the intermediate burden of proof, in between a preponderance of the evidence and proof beyond a reasonable doubt," *Araujo*, 708 F.3d at 159 (citing *Addington v. Texas*, 441 U.S. 418, 425 (1979), the clear-and-convincing standard requires the employer to show that "the truth of its factual contentions are highly probable," *id.* (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

Woven together, the contributing-factor standard and the AIR-21 burden-shifting framework are doubly protective of plaintiff-employees compared to other statutes: The causation burden on the plaintiff is lower at step one, while the burden on the employer is higher at step two. The AIR-21 scheme, the Supreme Court has instructed, "is meant to be more lenient [for plaintiffs] than most." *Murray*, 601 U.S. at 35; *see also Araujo*, 708 F.3d at 159–60 (stating that

---

2019). *McDonnell Douglas* applies to many Title VII discrimination and retaliation claims, *Lenzi*, 944 F.3d at 112, but the causation burden differs under each, *contrast* 42 U.S.C. § 2000e–2(m) (Title VII's antidiscrimination provision's "motivating factor" standard) *with Nassar*, 570 U.S. at 346–47 (holding that but-for causation applies to Title VII retaliation claims).

AIR-21 is "protective of plaintiff-employees" and "much easier for a plaintiff to satisfy than the *McDonnell Douglas* standard").

**D.** *Whether the FRSA Incorporates AIR-21 into Kickout Claims*

CSX first contends that AIR-21 and its contributing-factor causation standard do not apply to claims brought in federal district court pursuant to the FRSA's kickout provision, § 20109(d)(3), but only to the initial administrative proceedings before the DOL. Because the kickout provision is silent on the causation standard, CSX argues, the default but-for causation standard instead governs. Were we to adopt CSX's argument, we would be overturning our precedent, *see Tompkins*, 983 F.3d at 80 (holding that AIR-21 applies to claims brought under the kick-out provision); *see also Ziparo*, 15 F.4th at 158 (stating that the contributing-factor standard applies), which aligns with every other federal court of appeals to address the question.[9] We decline CSX's invitation.

---

[9] *See, e.g.*, *Tompkins*, 983 F.3d at 79–80; *Araujo*, 708 F.3d at 157; *Conrad v. CSX Transp., Inc.*, 824 F.3d 103, 107 (4th Cir. 2016); *Epple v. BNSF Ry. Co.*, 785 F. App'x 219, 222 (5th Cir. 2019) (summary order); *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 381 (7th Cir. 2018); *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014); *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018); *Fresquez v. BNSF Ry. Co.*, 52 F.4th 1280, 1296 (10th Cir. 2022); *Hitt v. CSX Transp., Inc.*, 116 F.4th 1309, 1315 (11th Cir. 2024); *see also Lemon v. Norfolk S. Ry. Co.*, 958 F.3d 417, 419 (6th Cir. 2020) (noting "uncertainties" about the statutory scheme but acknowledging that every court to consider an FRSA claim has employed the AIR-21 framework and proceeding with that analysis).

We begin with the text of § 20109(d). *See Mei Xing Yu v. Hasaki Rest., Inc.*, 944 F.3d 395, 400 (2d Cir. 2019). Section 20109(d) governs FRSA "[e]nforcement actions." Subsection (d)(2) incorporates the "rules and procedures" and "legal burdens of proof" of AIR-21 to "[a]ny action" brought under subsection (d)(1)—not just administrative actions before the DOL, as CSX contends. A kickout action is, of course, an action. *See* 49 U.S.C. § 20109(d)(3) (referring to the filing of a lawsuit in federal district court as "an original action"). Section 20109(d)(1), in turn, provides that "[a]n employee who alleges discharge, discipline, or other discrimination in violation of subsection (a), (b), or (c) of this section, may seek relief in accordance with *the provisions* of this section."[10] *Id.* § 20109(d)(1) (emphasis added). The kickout provision, § 20109(d)(3), is undoubtedly one such provision. *See* Provision, Black's Law Dictionary (8th ed. 2004) (defining a provision as, among other things, a "clause in a statute"). The text of the kickout

---

[10] We read § 20109(d)(1)'s statement that "any petition or other request for relief under this section to be initiated by filing a complaint with the Secretary of Labor," *id.*, to merely specify that an employee must first administratively exhaust their claims with the DOL by bringing an initial complaint before the agency. Moreover, because § 20109(d)(1) explicitly governs actions alleging a violation of § 20109(b)—the provision detailing the protected activity in which Ziparo engaged—and § 20109(d) incorporates AIR-21 to all actions, the statutory text also forecloses CSX's argument that actions alleging a violation § 20109(b) must meet a different causation burden than contributing-factor causation. *See* Appellee's Supp. Br. at 2–3.

provision—stating that the employee's action brought in federal district court is subject to "de novo review," 49 U.S.C. § 20109(d)(3)—further suggests that the district court is to review anew the employee's complaint, subject to the same AIR-21 framework that governs that complaint before the DOL. Thus, although the kickout provision is silent as to a governing framework, that does not matter: Subsections (d)(1) and (d)(2) collectively incorporate AIR-21 into any action brought under § 20109(d)—including, necessarily, kickout actions under § 20109(d)(3).

While we read the plain, statutory text to compel our conclusion, one additional consideration fortifies it: CSX's interpretation would result in the same FRSA claim being subject to two distinct frameworks depending on whether the DOL had issued a final decision within 210 days. Under CSX's interpretation, if the DOL had issued a final decision within the allotted time, we would simply review the DOL's determination under the AIR-21 framework pursuant to the Administrative Procedure Act. *See Metro-N. Commuter R.R. Co. v. U.S. Dep't of Lab.*, 886 F.3d 97, 105–06 (2d Cir. 2018); *Carter v. Sec'y, Dep't of Lab.*, 108 F.4th 1028, 1033 (8th Cir. 2024). But if the DOL had *not* issued a timely final decision, and the employee filed an action in federal district court, CSX would

have us apply an entirely different standard. Even without the statute's plain text as our guide, we think it improbable that Congress intended the "odd result[]," *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 136 (2d Cir. 2008), of two distinct frameworks governing the same retaliation claim simply because the DOL had not acted within 210 days. We therefore conclude, as we did in *Tompkins*, that the AIR-21 framework and its contributing-factor causation standard apply to FRSA actions brought in federal district court pursuant to the kickout provision, § 20109(d)(3).

Because *Murray* construed the same AIR-21 framework and contributing-factor causation standard in the SOX context that applies under the FRSA, its reasoning binds us here with equal force. *Compare* 18 U.S.C. § 1514A(b)(2)(C) ("An action brought [in federal district court under SOX] shall be governed by the legal burdens of proof set forth in [AIR-21]."), *with* 49 U.S.C. § 20109(d)(2)(A)(i) ("Any action brought under [the FRSA] shall be governed by the legal burdens of proof set forth in [AIR-21].").

## II. *Murray*'s Effect on Our FRSA Precedent

### A. *The Contributing-Factor Causation Standard and* Murray

Before *Murray*, a circuit split had emerged over the plaintiff's required causation burden in FRSA cases. On one side, the Third and Ninth Circuits held

that to meet their causation burden, an employee "*need not* demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his disclosure was a contributing factor to the personnel action." *See Araujo*, 708 F.3d at 158 (emphasis in original); *accord Frost v. BNSF Ry. Co.*, 914 F.3d 1189, 1196 (9th Cir. 2019). But the Seventh and Eighth Circuits concluded that some showing of retaliatory intent or animus was necessary for the plaintiff's prima facie case. *See Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 791 (8th Cir. 2014); *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969 (8th Cir. 2017); *Armstrong v. BNSF Ry. Co.*, 880 F.3d 377, 382 (7th Cir. 2018). Consistent with this split, our sister circuits differed as to whether temporal proximity alone could satisfy the plaintiff's prima facie causation burden—the courts that held that a plaintiff need not show retaliatory motive or intent decided that temporal proximity alone could suffice. *Contrast Araujo*, 708 F.3d at 160, *with Kuduk*, 768 F.3d at 792.

In *Tompkins*, we joined the Seventh and Eighth Circuits in holding that an FRSA plaintiff must "produce evidence of intentional retaliation prompted by the employee engaging in protected activity." 983 F.3d at 82. In affirming the district court's grant of summary judgment to the employer, we stated that

32

under the contributing-factor standard, "a showing of discriminatory animus, which the statute requires, necessarily includes some proof of retaliatory motive," "some evidence of retaliatory intent," or "evidence of intentional retaliation." *Id.* Although we noted that a plaintiff need not show "that the 'contributing factor' was the sole factor affecting the discipline or that the employer acted only with retaliatory motive," we held that a plaintiff must show "more than a temporal connection between the protected conduct and the adverse employment action" to meet their burden. *Id.* To determine whether the plaintiff presented a genuine factual issue on causation, we then "weigh[ed] . . . five highly relevant facts"[11] from the Eighth Circuit's opinion in *Gunderson* and concluded that, although two factors favored the plaintiff, the considerations, "on balance," tipped in the employer's favor. *Tompkins*, 983 F.3d at 82–83 (citing *Gunderson*, 850 F.3d at 969).

In *Murray*, we imported much of the *Tompkins* FRSA analysis into the SOX context. *Murray v. UBS Sec., LLC*, 43 F.4th 254, 260–61 (2d Cir. 2022). There, we vacated the jury's verdict and the district court's judgment of nearly $1 million in damages in favor of the plaintiff. *Id.* at 258, 263. Relying on both the "plain

---

[11] We examine these "facts" or "factors" further below.

meaning" of SOX and our interpretation in *Tompkins* of "a nearly identical provision in the [FRSA]," we concluded that the district court erred in failing to instruct the jury that the plaintiff "had to prove [the employer's] retaliatory intent to prevail" on his SOX claim. *Id.* at 258–60. Our holding created a circuit split over whether retaliatory intent was an element of a SOX claim. *See Murray*, 601 U.S. at 32 (noting circuit split). *Contrast Murray*, 43 F.4th at 258–61, *with Coppinger-Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010), *and Halliburton, Inc. v. Administrative Rev. Bd.*, 771 F.3d 254, 263 (5th Cir. 2014) (per curiam).

The Supreme Court's unanimous opinion in *Murray* definitively resolved this circuit split, holding that SOX does not include a retaliatory intent or animus requirement. *Murray*, 601 U.S. at 35 ("The Second Circuit was wrong when it . . . impose[d] an additional requirement that the whistleblower plaintiff prove the employer's 'retaliatory intent' or animus."). The Court explained that "an animus-like retaliatory intent requirement" is "simply absent" from SOX's statutory text. *Id.* at 33–34. A SOX plaintiff, the Court explained, does not need to prove "intent" to meet their causation burden; instead, "[t]he burden-shifting framework provides a means of getting at intent, and Congress here has decided that the plaintiff's burden on intent is only to show that the protected activity

was a contributing factor in the unfavorable personnel action." *Id.* at 36. And the meaning of a "contributing factor," the Court elaborated, is "broad indeed," requiring only that the factor "have a share in bringing about (a result); [or to] be partly responsible for [a result]." *Id.* at 37. Applying the Supreme Court's instruction on remand, we explained that a contributing factor must "*actually* cause or help cause the termination decision." *Murray*, 128 F.4th at 366.

### B.     Murray *Requires Us to Overturn Our FRSA Precedent*

"While as a general rule, one panel of this Court cannot overrule a prior decision of another panel, an exception [] arises where there has been an intervening Supreme Court decision that casts doubt on our controlling precedent." *Wojchowski v. Daines*, 498 F.3d 99, 106 (2d Cir. 2007). The intervening decision "need not address the precise issue decided by the panel for this exception to apply," *In re Zarnel*, 619 F.3d 156, 168 (2d Cir. 2010), but there must be "a conflict, incompatibility, or inconsistency between this Circuit's precedent and the intervening Supreme Court decision," *United States v. Afriyie*, 27 F.4th

161, 168 (2d Cir. 2022). Applying these principles, we conclude that *Murray* has abrogated several of our conclusions in *Tompkins*.[12]

After *Murray*, we can no longer consider as good law our statements in *Tompkins* that "some evidence of retaliatory intent is a necessary component of an FRSA claim," that the statute "necessarily includes some proof of retaliatory motive," and that "an FRSA plaintiff must produce evidence of intentional retaliation prompted by the employee engaging in protected activity." 983 F.3d at 82. *Murray* clearly held that retaliatory intent is no longer a relevant consideration for a SOX claim subject to AIR-21. *See, e.g.*, 601 U.S. at 32 ("[A] [SOX claim] does not require proof of 'retaliatory intent.'"); *id.* at 34 ("[T]he word 'discriminate' does not "inherently require[] retaliatory intent."); *id.* at 37 ("While the Second Circuit attempted to make 'retaliatory intent' a requirement for satisfaction of the 'contributing factor' element, UBS does not ask this Court to follow suit, and for good reason."); *id.* ("[AIR-21] burden shifting—and not some separate, heavier burden on the plaintiff to show 'retaliatory intent'—is what the statute requires."). The *Murray* Court's holdings apply equally to an

---

[12] We have circulated our opinion to all active judges of the court prior to filing and received no objection. *See United States v. Bedi*, 15 F.4th 222, 232 (2d Cir. 2021).

FRSA claim incorporating the same AIR-21 framework as SOX. Thus, we overrule *Tompkins*'s holding that a plaintiff must show retaliatory intent, animus, or motive to meet their contributing-factor causation burden.

Our post-*Murray* task is not yet finished, however. In *Tompkins*, we also held that the plaintiff "must . . . show more than a temporal connection between the protected conduct and the adverse employment action . . . to present a genuine factual issue on retaliation." 983 F.3d at 82. To be sure, if some showing of an employer's retaliatory "animus" or "motive" were a requirement of the statute, *id.*, it might follow logically that temporal proximity—which offers direct proof of neither—would necessarily be insufficient on its own to meet the plaintiff's causation burden. But because *Murray* made plain that the causation standard imposes no such animus or motive requirement on the plaintiff, *see* 601 U.S. at 32, 34, 37, and that the contributing-factor standard is a "lenient" and "broad" standard for plaintiffs, *id.* at 35, 37, *Tompkins*'s conclusion as to temporal proximity no longer follows, *see Sullivan v. Am. Airlines, Inc.*, 424 F.3d 267, 274 (2d Cir. 2005) (overruling prior panel when intervening Supreme Court decision "entirely undermine[d]" the assumption underlying the prior panel's statutory analysis).

Our conclusion that sufficiently close temporal proximity may satisfy the plaintiff's contributing-factor causation burden brings us in line with our sister circuits that did not require a showing of retaliatory intent before *Murray*. *See Araujo*, 708 F.3d at 160. It also harmonizes our FRSA precedent with our precedent holding that sufficiently close temporal proximity may establish the plaintiff's prima facie causation burden under other antiretaliation provisions— including those that impose higher causation burdens than the FRSA. *See, e.g., Banks v. Gen. Motors, LLC*, 81 F.4th 242, 277 (2d Cir. 2023) (stating that our case law has "held that a period of several months can demonstrate a causal connection between the protected activity and the alleged adverse action" for Title VII retaliation claims); *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) (explaining that "the but-for causation standard [for Title VII retaliation claims] does not alter the plaintiff's ability to demonstrate causation at the prima facie stage on summary judgment or at trial indirectly through temporal proximity" and concluding that the "three-week period from [the employee's] complaint to her termination is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity"). It would be peculiar indeed if we imposed a higher burden on a plaintiff bringing a

38

contributing-factor claim than we do for plaintiffs proceeding under more burdensome causation standards. *See Murray*, 601 U.S. at 36 (noting that the contributing-factor standard applies a lower bar for plaintiffs than do other statutes).

Of course, a plaintiff proceeding with temporal-proximity evidence alone must demonstrate that the protected activity and adverse acts were sufficiently close in order to meet his contributing-factor causation burden. Under other employment statutes, we have declined to draw a "bright line" demarcating the permissible outer limits of that proximity. *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001). We have instead permitted courts to "exercise [their] judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009). Nonetheless, our caselaw teaches that a period of several weeks to several months may establish the required causal relationship. *See, e.g.*, *Zann Kwan*, 737 F.3d at 845 (several-week period); *Banks*, 81 F.4th at 277 (several months); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("[W]e have previously held that five months is not too long to find the causal relationship."). That said, courts should also

consider not only the "passage of a significant amount of time," but also whether "some legitimate intervening event" severs the causal connection. *Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014). Where a plaintiff relies on both temporal proximity and other forms of evidence, however, "we have recognized that the lapse in time between the protected activity and adverse action can be longer." *Banks*, 81 F.4th at 277–78.

To the extent that we suggested in *Tompkins* that the FRSA causation inquiry requires a balancing of the five *Gunderson* "facts" or "factors," that proposition, too, can no longer stand under *Murray*. *See Tompkins*, 983 F.3d at 82–83 (weighing the five factors and concluding that they tip in the defendant's favor even though two of the factors "favor [the plaintiff]"). These "facts" or "factors" are:

> (1) whether and to what extent the disciplinary measures were related to the protected activity, (2) the temporal relationship between the protected activity and the disciplinary measures, including whether any intervening incidents occurred that could independently justify the discipline, (3) whether the disciplined employee was represented by counsel or a similar representative in the disciplinary proceedings, and whether the disciplinary measures were upheld on appeal, (4) whether, if applicable, the disciplinary measures were upheld following Department of Labor proceedings, and (5) whether the persons accused of

40

> hostility towards the employee's protected activity participated in the disciplinary decision.

*Id.* In *Gunderson*, the Eighth Circuit noted that these "five highly relevant facts [stood] out" based on its understanding that an FRSA plaintiff "must submit sufficient evidence of 'intentional retaliation prompted by the employee engaging in protected activity.'" 850 F.3d at 969 (quoting *Kuduk*, 768 F.3d at 791). But *Murray* has now jettisoned that understanding of contributing-factor causation, explaining that it "was wrong" to "impose[] an additional requirement that the whistleblower plaintiff prove the employer's 'retaliatory intent' or animus." *Murray*, 601 U.S. at 35. Instead, a "plaintiff's burden on intent is only to show that the protected activity was a 'contributing factor in the unfavorable personnel action.'" *Id.* at 36 (quoting 49 U. S. C. § 42121(b)(2)(B)(i)). Because an employee may be able to meet their prima facie causation burden with sufficiently close temporal proximity alone, it follows that on a defendant's motion for summary judgment, a court need not weigh these other factors to determine that a reasonable juror could find that the plaintiff has met their causation burden.[13]

---

[13] As a guidepost for district courts, such circumstantial evidence can include "temporal proximity, indications of pretext, inconsistent application of an employer's

As a broader principle, the FRSA does not deem any type of evidence categorically insufficient to meet the contributing-factor causation standard. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[T]he law makes no distinction between the weight or value to be given to either direct or circumstantial evidence."). As the *Murray* Court elaborated, "[s]howing that an employer acted with retaliatory animus is one way of proving that the protected activity was a contributing factor in the adverse employment action, *but it is not the only way*." 601 U.S. at 37 (emphasis added). A plaintiff may therefore meet their burden through either direct or circumstantial evidence, or both. *See id.* at 36 (explaining that the AIR-21 burden-shifting framework forces "the defendant to come forward with some response to the employee's circumstantial evidence"); *Araujo*, 708 F.3d at 161. As the Supreme Court recognized in the Title VII discrimination context, "[c]ircumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Costa*,

---

policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward the complainant after he or she engages in protected activity." *Sirois*, 797 F. App'x at 59–60 (quoting *Niedziejko v. Del. & Hudson Ry. Co.*, No. 18-0675, 2019 WL 1386047, at *43 (N.D.N.Y. Mar. 27, 2019)). This non-exhaustive list derives from the ARB's decision in *Defrancesco, v. Union Railroad Co.*, ARB No. 10-114, 2012 WL 694502, at *3 (Admin Rev. Bd. Feb. 29, 2012).

539 U.S. at 100; *Bart*, 96 F.4th at 569 ("Circumstantial evidence is often the sole avenue available to most plaintiffs to prove discrimination."). Such circumstantial evidence may, of course, include temporal proximity.

In essence, we previously imposed a higher causation burden on FRSA plaintiffs than the statutory text can bear. As *Murray* emphasized, within the "lenient" contributing-factor burden-shifting framework, 601 U.S. at 35, a contributing factor is "broad indeed." *id.* at 37. An employer should not take personnel actions against employees "based on protected whistleblowing activities—not even a little bit." *Id.* at 36–37. An FRSA plaintiff can therefore withstand summary judgment on causation so long as they proffer sufficient evidence—direct or circumstantial, including evidence of temporal proximity— from which a reasonable jury could infer that the plaintiff's protected activity contributed, in any way, to the challenged adverse action.

## III. Ziparo's Present Appeal

Having laid the groundwork for considering Ziparo's FRSA claim, we turn to the merits of his appeal. Again, the two-step AIR-21 framework provides that Ziparo must first make out a prima facie case of retaliation under the FRSA by establishing by a preponderance of the evidence that (1) he engaged in protected

activity; (2) CSX knew that he engaged in the protected activity; (3) he suffered an unfavorable personnel action; and (4) the protected activity was a contributing factor in the unfavorable action. *Ziparo II*, 15 F.4th at 158. At the summary judgment stage, Ziparo's claim survives so long as he establishes a genuine dispute of material fact as to each element of his claim. *See* Fed. R. Civ. P. 56(a). If Ziparo meets his burden, CSX must prove, by clear and convincing evidence, "that [it] would have taken the same unfavorable personnel action in the absence of that behavior." 49 U.S.C. § 42121(b)(2)(B)(ii).

### A.    *Ziparo's Retaliatory Hostile Work Environment*

We first examine Ziparo's claim that he was subjected to a retaliatory hostile work environment before his ultimate termination. The timing of Ziparo's protected activity is key: An employer generally cannot be liable for an adverse action if that action predates the plaintiff's protected activity. *See Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

### 1. *Whether Ziparo Engaged in Protected Activity Before May 2016*

At the first step of evaluating Ziparo's prima facie case, we conclude that the district court erred in limiting Ziparo's protected activity to his two safety-related complaints in early May 2016. *See Ziparo III*, 2023 WL 2424599, at *4 (finding that "the 'protected activity' engaged in by [Ziparo] . . . consisted of his

twice complaining in good faith in early May 2016"). The district court reached this conclusion by reasoning that, under *Ziparo II*, protected activity could not consist of "*experiencing* a hazardous safety or security condition . . . but [only] *reporting* that condition." *Id.* at *5 (emphasis in original). Because the district court found that Ziparo engaged in protected activity only in May 2016, it did not consider whether he suffered an adverse employment action *before* May 2016. Although the district court correctly stated the law, it misapplied it in failing to consider Ziparo's informal complaints before May 2016 that the pressure to falsify the OBWOs created unsafe working conditions.

In *Ziparo II*, we held that "§ 20109(b)(1)(A) protects an employee reporting what she sincerely believes constitutes a hazardous safety [] condition, regardless of whether the railroad or a similarly situated employee would reach the same conclusion or whether the report relates to physical conditions or to employment practices that create safety or security hazards." 15 F.4th at 164–65. The FRSA protects both informal and formal complaints. *See id.* at 165–66 (holding that Ziparo's informal complaints, if credited by a jury, constitute FRSA protected activity); *Monohon v. BNSF Ry. Co.*, 17 F.4th 773, 777, 783 (8th Cir. 2021) (reversing the district court's order granting the defendant's motion for judgment as a

45

matter of law where plaintiff expressed safety concerns about a seatbelt rule in a conference call with a supervisor); *cf. Summa v. Hofstra Univ.*, 708 F.3d 115, 126–27 (2d Cir. 2013) (holding that Title VII protects "informal protests of discrimination, including making complaints to management").  Thus, so long as "Ziparo believed that Lacy's and Van Blarcom's demands were creating an unsafe environment by causing Ziparo (and at least one other employee, Pigula) to be stressed and distracted and therefore unable to focus properly on their work" and lodged "complaints of stressful and distracting work conditions," Ziparo engaged in protected activity under the FRSA.  *Id.* at 165.

The precise timeline for Ziparo's initial protected activities is muddled, but we think that a reasonable juror could find that Ziparo engaged in protected activity beginning no later than April 2016—before several allegedly retaliatory actions.  As Ziparo testified at his deposition, he and Pigula told Van Blarcom and Lacy "multiple times that the environment that they're creating is unsafe," before filing a formal ethics complaint in May 2016.  Joint App'x 1291–92.  Despite Ziparo's complaints, the problem "wasn't stopping" and "was just getting worse," which led Ziparo to file a formal complaint to "document[]" his concerns in May 2016.  *Id.* at 1293.  Ziparo's assertion that he engaged in

protected activity in April 2016 is consistent with Pigula's, who testified that Ziparo complained to Lacy "[o]n a daily basis, at least three days a week" for the "whole time that Mr. Lacy was there" that the requests were "going to be a safety issue."[14] *Id.* at 1308–09. To be sure, there is conflicting testimony. Lacy stated that Ziparo mentioned his safety concerns only "one time," in connection with the threatened insubordination charge on May 3, 2016. *Id.* at 799–800. Van Blarcom, meanwhile, stated that Ziparo complained to him several times, including what he "believe[d]" to be prior to the May 3 ethics complaint, *id.* at 728–29, and before April 13, *id.* at 764, although he did not say whether those complaints raised safety concerns, *id.* at 728–29. But because we do not "resolve" factual issues on a motion for summary judgment, *In re Dana Corp.*, 574 F.3d at 156, a jury must determine whether to credit Ziparo's and Pigula's testimony that Ziparo raised safety concerns in April 2016 and therefore engaged in protected activity, *see Ziparo II*, 15 F.4th at 165–66.

### 2. *Ziparo's Retaliatory Hostile Work Environment Theory*

Because the district court erred in limiting Ziparo's protected activity to his complaints in May 2016, it did not consider the possibility that Ziparo

---

[14] Lacy began working as a trainmaster in Watertown beginning in September 2015.

experienced a retaliatory hostile work environment *before* May 2016.  Previously,

we have not explicitly addressed whether a retaliatory hostile work environment

is a cognizable adverse employment action under the FRSA.[15]

We conclude that a retaliatory hostile work environment is a cognizable

adverse employment action under the FRSA.  The relevant provision of the

FRSA, 49 U.S.C. § 20109(b), prohibits an employer from "discharg[ing],

demot[ing], suspend[ing], reprimand[ing], or in any other way discriminat[ing]

against an employee" for engaging in protected activity.  "[T]he 'normal

definition' of 'discrimination' is 'differential treatment,'" meaning that the

employer "intentionally" treats the employee "worse."  *Murray*, 601 U.S. at 34.  A

retaliatory hostile work environment—where the employer treats an employee

worse because of protected activity, even if a plaintiff has not "suffered economic

consequences," *Laurent-Workman v. Wormuth*, 54 F.4th 201, 216 (4th Cir. 2022)—is

one such act of discrimination, *see Richardson v. N.Y. State Dep't of Corr. Serv.*, 180

F.3d 426, 446 (2nd Cir. 1999), *abrogated on other grounds by Burlington N. & Santa*

*Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (recognizing that a retaliatory hostile work

---

[15] CSX appears to concede that a retaliatory hostile work environment is a cognizable claim.  *See* Appellee's Br. at 39 n.7.

environment may constitute an adverse employment action for a Title VII retaliation claim).

We must next determine the appropriate standard for retaliatory hostile work environment claims under the FRSA. In federal law, two principal hostile work environment standards have emerged. For Title VII *discrimination* claims, a plaintiff must show that the "workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[16] *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *see Terry v. Ashcroft*, 336 F.3d 128, 147–48 (2d Cir. 2003). For Title VII *retaliation* claims, however, we have explained that the definition of a hostile work environment is

---

[16] In *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346 (2024), the Supreme Court adopted a broader construction of adverse employment action for Title VII discrimination claims, no longer requiring a plaintiff to show "that the harm incurred was significant[ ] [o]r serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar," *id.* at 355. The effect of *Muldrow* on discriminatory hostile work environment claims is still unclear: Post-*Muldrow*, the Sixth Circuit has held that *Muldrow* applies to such claims and no longer requires "plaintiffs to show 'significant' harm." *McNeal v. City of Blue Ash*, 117 F.4th 887, 904 (6th Cir. 2024). *But see Dike v. Columbia Hosp. Corp. of Bay Area*, No. 24-40058, 2025 WL 315126, at *5 n.25 (5th Cir. Jan. 28, 2025) (summary order) (rejecting the plaintiff's argument that *Muldrow* changed the severe-or-pervasive test). We have not yet opined on *Muldrow*'s impact on discriminatory hostile work environment claims, and the question is not before us here.

"broader" than in the antidiscrimination context. *Carr v. N.Y.C. Transit Auth.*, 76 F.4th 172, 179 (2d Cir. 2023). That proposition is derived from *Burlington Northern & Santa Fe Railway Company v. White*, 548 U.S. 53 (2006), where the Supreme Court held that an adverse employment action for a Title VII retaliation claim requires a plaintiff to show only "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination," *id.* at 68. Applying the *Burlington Northern* principle to a retaliatory hostile work environment claim, we held in *Carr* that to establish an adverse employment action for a prima facie case of Title VII retaliation, the "plaintiff need only show that the allegedly retaliatory actions, taken either singularly or in the aggregate, were materially adverse," where a "materially adverse action is one that well might have dissuaded a reasonable worker from [engaging in protected activity]." 76 F.4th at 180.

We think that the reasoning in *Burlington Northern* and *Carr* compel us to conclude that the broader definition of a retaliatory hostile work environment applies in the FRSA context. *See Allen v. Admin. Rev. Bd.*, 514 F.3d 468, 476 n.2 (5th Cir. 2008) (holding that *Burlington Northern* applies to SOX). In holding that

the definition of an adverse employment action is broader for Title VII retaliation claims than antidiscrimination claims, the Supreme Court focused on the textual differences between the two Title VII provisions:  Whereas the antidiscrimination provision prohibits discrimination with "respect to [an employee's] compensation, terms, conditions, or privileges of employment," the antiretaliation provision makes it unlawful for an employer to "discriminate against" an employee for protected activity.  *Burlington Northern*, 548 U.S. at 61–63 (first quoting 42 U.S.C. § 2000e-2(a)(1); and then quoting *id.* § 2000e-3(a)).  The Court reasoned that because the antidiscrimination provision speaks to actions "that affect employment or alter the conditions of the workplace," while "[n]o such limiting words appear in the antiretaliation provision," the antiretaliation provision sweeps more broadly.  *Id.* at 62–63.  The relevant provision of the FRSA contains both the same prohibition on "discrimination" as Title VII's antiretaliation provision and an enumerated list of even broader adverse employment actions, such as an employer "reprimand[ing]" an employee for protected activity.  49 U.S.C. § 20109(b) (a railroad carrier "may not discharge, demote, suspend, reprimand, or in any other way discriminate against an employee").  We therefore conclude that the *Carr/Burlington Northern* standard

applies to a claim of a retaliatory hostile work environment under the FRSA—

which, here, is an aggregate set of retaliatory actions that "well might have

dissuaded a reasonable worker from [engaging in protected activity]." *Carr*, 76

F.4th at 180.

Applying this standard, we conclude that a reasonable juror could find

that CSX subjected Ziparo to actions that might well have dissuaded a reasonable

employee from making safety complaints. Illustratively: After Ziparo began

making safety complaints, Van Blarcom's scrutiny of Ziparo intensified, Joint

App'x 549–51, 1289, Van Blarcom may have selectively brought the handbrake

charge against Ziparo, *see id.* at 549, Van Blarcom "reamed" and "chew[ed]"

Ziparo out daily, *id.* at 550–52, and Lacy, following Van Blarcom's directive,

"scream[ed]" at Ziparo and threatened to fire Ziparo for insubordination,[17] *id.* at

555–56, 797, 812.

CSX counters that Ziparo's hostile work environment claim fails because

there is no evidence of violence or threats of violence against Ziparo. But our

---

[17] In determining whether CSX subjected Ziparo to a retaliatory hostile work environment, the jury should carefully consider whether these acts occurred *after* Ziparo engaged in the protected activity of making safety-related complaints.

caselaw requires no such showing—while threats of violence are, of course, highly probative of a hostile work environment, an employee in the Title VII retaliation context can show a hostile work environment without such evidence. *See Carr*, 76 F.4th at 181 ("All that is relevant is whether the actions, taken in the aggregate, are materially adverse and would dissuade a reasonable employee from making a complaint of discrimination."). Even under the Title VII antidiscrimination provision's heightened "severe or pervasive" test, a single incident can support a hostile work environment even when it does not involve an "actual or threatened physical assault." *Banks*, 81 F.4th at 263. A jury must determine whether these actions would have dissuaded a reasonable employee from making the safety complaints.

### 3. *Contributing-Factor Causation*

As to the last element of Ziparo's prima facie showing—that his protected activity was a contributing factor in the retaliatory actions—we conclude that Ziparo has proffered sufficient evidence to withstand summary judgment. Not only is there tight temporal proximity—Ziparo's safety-related complaints and Van Blarcom's and Lacy's retaliatory actions seem to have occurred in a span of about a month—but it also seems that Van Blarcom and Lacy engaged in that conduct precisely *because* Ziparo refused to falsify the OBWO records and

complained about the safety effects of doing so.  Indeed, CSX concedes that the "the record shows that Van Blarcom and Lacy exhibited some hostility or antagonism towards Ziparo."  Appellee's Br. at 31.  And the supervisors' marked change in attitude toward Ziparo intensified after Ziparo's protected activity began.  *See* Joint App'x at 1292–93 (Ziparo stating that the retaliatory actions were "getting worse" after he told Van Blarcom and Lacy "that the environment that they're creating is unsafe").

CSX objects that Van Blarcom's and Lacy's hostility and attitude changes arose because of Ziparo's refusal to falsify the OBWOs, rather than because of his protected activity of complaining that the requests were creating an unsafe working environment.  *See* Appellee's Br. at 31–32.  But Ziparo's refusals to falsify the OBWO records and his safety-related complaints are sufficiently intertwined to preclude summary judgment on causation.  Indeed, all that Ziparo would need to show at this stage is that his safety complaints "played only a very small role" in the adverse action, not that that those complaints were "the *only* reason or that no other factors influenced" Ziparo's supervisors.  *Frost*, 914 F.3d at 1196–97 (emphasis in original).  In any event, an employer's "legitimate, non-retaliatory reason for the adverse action . . . is, with rare exception, not to be

54

considered at the initial causation stage." *DeFrancesco v. Union R.R. Co.*, ARB No. 13-57, 2015 WL 5921329, at *3 (Admin. Rev. Bd. Sep. 30, 2015). For if we wereto conclude that an employer could split hairs between protected and non-protected aspects of an employee's complaint, employers could readily inoculate themselves against liability in retaliation cases.

### 4. CSX's Affirmative Defense

Because summary judgment is inappropriate at step one of AIR-21, Ziparo's prima facie case, we next consider whether CSX has met its burden at the second step. CSX has not offered an argument that, by clear and convincing evidence, it would have undertaken the adverse actions in the absence of Ziparo's protected activity. *See* 49 U.S.C. § 42121(b)(2)(B)(ii). In any event, CSX would have difficulty pointing to, in its own words, any factors wholly "extrinsic" to Ziparo's protected activity that would "independently lead to [CSX's] decision to take the [adverse actions]." Appellee's Br. at 47 (quoting *DeFrancesco*, ARB No. 13-57, 2015 WL 5921329, at *6)). As discussed above, to the extent that CSX suggests that its supervisors undertook retaliatory actions because Ziparo refused to submit fraudulent OBWOs, rather than because of his safety complaints themselves, that defense is unavailing here, where the protected and non-protected elements of Ziparo's complaints are tightly

intertwined. Indeed, in considering what would have happened in the "absence of" the employee's protected activity, we must excise not only "the protected activity" but also "the facts logically connected to the protected activity." *Speegle v. Stone & Webster Constr., Inc.*, ARB No. 13-74, 2014 WL 1870933, at *7 (Admin Rev. Bd. Apr. 25, 2014). Here, had Ziparo not repeatedly made unheeded safety complaints, perhaps his protected activity would not have created escalating "tension and animosity," *id.*, that culminated in Van Blarcom's and Lacy's threats to fire Ziparo, *see* Joint App'x 1292–93 (Ziparo testifying that Van Blarcom and Lacy were "making it worse and worse" after his initial safety complaints). A jury must consider this scenario.

As to the suggestion that CSX could lawfully retaliate against Ziparo for his refusal to commit fraud,[18] that contention overshoots the mark. Step two of AIR-21 does not require an employer to provide a *legitimate* business reason for adverse actions; instead, it asks whether the employer would have taken the same adverse action in the absence of protected activity. 49 U.S.C. § 42121(2)(B)(ii). CSX's argument suggests that an *illegitimate* business reason—

---

[18] CSX makes this suggestion when discussing causation, rather than its affirmative defense. *See* Appellee's Br. at 31–32.

such as retaliating against an employee who refuses to commit fraud—could

satisfy its burden under AIR-21.  But Congress intended AIR-21 to be more

"lenient," *Murray*, 601 U.S. at 35, and "much easier for a plaintiff to satisfy than

[other] standard[s]," *Araujo*, 708 F.3d at 159.  For that reason, in the AIR-21

context, the ARB has considered whether the adverse action "advanced a

legitimate business reason that would have occurred for reasons extrinsic to the

[protected] activity itself" or "a legitimate, non-discriminatory business reason

unrelated to [the plaintiff's] protected activity."  *Menendez v. Halliburton, Inc.*,

ARB No. 12-26, 2013 WL 1385561, at *10 (Admin. Rev. Bd. Mar. 15, 2013), *aff'd sub

nom.*, *Halliburton, Inc. v. Admin. Rev. Bd.*, 771 F.3d 254 (5th Cir. 2014).

Here, by all accounts—as evidenced by CSX's investigatory findings and

disciplinary actions against Van Blarcom and Lacy, *see* Joint App'x 1396–99—

Ziparo fully complied with CSX policy in correctly marking the OBWOs.

Because there is no indication that Ziparo engaged in misconduct in refusing to

falsify the OBWOs, CSX would be hard-pressed at this stage to proffer a

*legitimate* business reason wholly extrinsic to Ziparo's protected activity for its

adverse employment actions.  *See Fordham v. Fannie Mae*, ARB No. 12-61, 2014

WL 5511070, at *23 (Admin. Rev. Bd. Oct. 9, 2014) (framing the employer's

burden as "proving by 'clear and convincing evidence' not only the existence of a legitimate, non-retaliatory basis for the contested personnel action but that the employer would have taken the contested action on that basis alone had the complainant not engaged in protected activity").

## B. *Ziparo's Termination Theory*

Finally, we turn to Ziparo's challenge to his ultimate termination. It is undisputed that Ziparo engaged in protected activity by raising his safety concerns with Lacy on May 3, 2016, and through the CSX's ethics hotline on May 4, that CSX knew of Ziparo's protected activity, and that Ziparo's termination constitutes an adverse employment action. The sole issue as to Ziparo's prima facie case is therefore whether he can show by a preponderance of the evidence that his protected activity was a contributing factor in his termination. *See* 49 U.S.C. § 42121(b)(2)(B)(i). If Ziparo meets his burden, we must determine whether CSX has demonstrated by clear and convincing evidence that it would have terminated Ziparo had he not engaged in protected activity. *See id.* § 42121(b)(2)(B)(ii).

As we understand Ziparo's theory, he does not argue that the undue stress caused by Van Blarcom and Lacy interfered with his job duties and caused him

to leave the switch misaligned on June 9; instead, he contends, the switch incident was independent from his protected activity but CSX's decision to terminate him based on that incident was retaliatory. *See* Appellant's Br. at 51. That leaves open two questions: (1) whether, as to Ziparo's prima facie burden, there is evidence from which a reasonable juror could conclude that his protected activity contributed in any way to CSX's decision to terminate him, even if CSX may have had legitimate reason to do so; and (2) if Ziparo meets his burden, whether CSX can show by clear and convincing evidence that it would have terminated Ziparo in the absence of his protected activity.

### 1. *Ziparo's Prima Facie Contributing-Factor Causation Burden*

In light of the Supreme Court's construction of the contributing-factor standard in *Murray*, we conclude that Ziparo has met his causation burden. To meet his burden on summary judgment, Ziparo must show that a reasonable juror could find that his protected activity contributed in any way to CSX's decision to terminate his employment, even "if [the protected activity] played only a very small role in [CSX's] decision-making process." *Frost*, 914 F.3d at 1197; *see Murray*, 601 U.S. at 36–37 ("[P]ersonnel actions against employees should quite simply not be based on protected whistleblowing activities—not even a little bit."). Several pieces of evidence compel our conclusion.

First, there is clear evidence of employer hostility or antagonism toward Ziparo, which CSX concedes. *See* Appellee's Br. at 31 ("[T]he record shows that Van Blarcom and Lacy exhibited some hostility or antagonism towards Ziparo."). As recounted above, this antagonism appears to have stemmed, at least in part, from Ziparo's safety-related complaints. Significantly, CSX employees who were either hostile to Ziparo or knew of Ziparo's complaints were involved in the termination process. In fact, Van Blarcom served as the charging offer at the hearing on June 16, 2016, that ultimately resulted in Ziparo's termination. *See* R7.1 Resp. (Dist. Ct. Dkt. 50-28) ¶ 184. Additionally, Jerry Lewandowski, the Assistant Division Manager for the Albany Division—who, according to Lacy, told Lacy that he would be "watching" Ziparo because of Ziparo's ethics complaint, *see* Joint App'x 845 ¶ 12—signed the rule violation letter against Ziparo on June 13, 2016, *see* R7.1 Resp. (Dist. Ct. Dkt. 50-28) ¶ 183. Although there does not appear to be evidence that the two ultimate decision-makers— Brian Murray, who served as the hearing officer, *see id.*, and Division Manager of the Albany Division Bill Sester, who terminated Ziparo, *see* Joint App'x 1130— expressed hostility or antagonism to Ziparo, the record suggests that they knew, at the very least, about Ziparo's ethics complaint, *see id.* at 700 (Van Blarcom's

testimony that Sester was aware of Ziparo's ethics complaint); *id.* at 836 (Lacy's testimony that he "may have discussed" Ziparo's complaints with Murray and that Ziparo's ethics complaint "became common knowledge"); *id.* at 1350 (Lacy stating that Sester "would have to know about [the ethics complaint] because "Sester handed down any ruling that the ethics department made"); *id.* at 1357 (Lacy's testimony that Sester discussed the investigation of Ziparo's complaint with him).

Second, although a legitimate intervening event between protected activity and a termination may justify an adverse action by severing the causal relationship between the two, *Feldman*, 752 F.3d at 348, the close temporal proximity of about two months between Ziparo's protected activity and termination support an inference of causation, *see, e.g.*, *Gorman-Bakos*, 252 F.3d at 555 (holding that a period of four months between the protected activity and the adverse action was "sufficient to support an allegation of a causal connection strong enough to survive a summary judgment motion"). Indeed, not only is there close temporal proximity between Ziparo's protected activity and his termination, there is also close temporal proximity between Van Blarcom's and Lacy's earlier retaliatory actions—including threatening to fire Ziparo—and

Ziparo's ultimate termination.  In other words, CSX may have had the urge to strike while the retaliatory iron was still hot.

Last but not necessarily least, CSX inconsistently applied its policies in firing Ziparo:  It terminated only six out of the seventeen other employees charged with similar CSX rules violations as Ziparo.  *See Ziparo III*, 2023 WL 2424599, at *6.  Such circumstantial evidence of disparate treatment among similarly situated employees is relevant to both the plaintiff's showing of a prima facie inference of causation and CSX's affirmative-defense burden.  *Araujo*, 708 F.3d at 162 (considering disparate-treatment evidence at both steps of AIR-21).  CSX's inconsistency in terminating employees for the same offense, coupled with substantial evidence of hostility toward Ziparo, all in a several-month span, suggest that Ziparo's protected activity may have contributed at least to some extent to CSX's decision to terminate his employment.

### 2. CSX's Affirmative Defense

Finally, we conclude that CSX has failed to demonstrate, by clear and convincing evidence, that it would have terminated Ziparo had he not engaged in protected activity.  *See* 49 U.S.C. § 42121(b)(2)(B)(ii).

"The right way to think about [the employer's affirmative defense]," as the Supreme Court explained in *Murray*, "is to change one thing at a time and see if the outcome changes": If an employer would have let go an otherwise identical employee who had not engaged in the protected activity, the employer has met its burden. 601 U.S. at 38. But an employer does not meet this burden merely by proving what it *could* have done—instead, it must show what it *would* have done in a counterfactual scenario in which the plaintiff had engaged in no protected activity. *See Brousil v. U.S. Dep't of Lab.*, 43 F.4th 808, 812 (7th Cir. 2022). And it must prove this counterfactual under the "steep" evidentiary burden of clear-and-convincing evidence, *Araujo*, 708 F.3d at 162, such that the material offered "instantly tilt[s] the evidentiary scales" in the employer's favor, *Colorado*, 467 U.S. at 316. Because of both the heavy evidentiary burden and the fact-intensive character of this inquiry, the employer's "affirmative defense is often not suitable for summary judgment determination." *Kuduk*, 768 F.3d at 793.

The factors our sister circuits have considered in determining whether the employer has met its burden include: "(1) how 'clear' and 'convincing' the independent significance is of the non-protected activity; (2) the evidence that proves or disproves whether the employer 'would have' taken the same adverse

63

actions; and (3) the facts that would change in the 'absence of' the protected activity." *Brousil*, 43 F.4th at 812. Of course, since "[e]ach case is different, and some factors that are critical in one case may shed little light in another case," *Parker v. BNSF Ry. Co.*, 137 F.4th 957, 965 (9th Cir. 2025), we "holistically consider any and all relevant, admissible evidence," *Brousil*, 43 F.4th at 812.

To meet its burden, CSX relies exclusively on its finding that Ziparo was responsible for the switch incident, which, it posits, justifies its decision to terminate his employment. But whether CSX *could have* terminated Ziparo does not end our inquiry: "While the facts in the record may show that [the plaintiff] was technically in violation of written rules, they do not shed any light on whether [the defendant's] decision to [undertake the adverse employment action] was retaliatory." *Araujo*, 708 F.3d at 163. Here, the undisputed evidence that CSX terminated only six of the seventeen similarly situated employees leaves us unconvinced that it was "highly probable or reasonably certain" that CSX would have terminated Ziparo had he not engaged in protected activity.[19]

---

[19] At oral argument, CSX contended that it terminated four of five other conductors in 2016 for similar rules violations, which, it posits, demonstrates that it consistently terminated similarly situated employees to meet its affirmative-defense burden. *See* Oral Audio Recording, *Ziparo v. CSX Transportation, Inc.*, No. 23-262, at 13:00–14:17. But whether 2016 or a broader time period is the relevant time period to assess CSX's consistent-treatment argument is a factual question for the jury to resolve.

Appellee's Br. at 46. In other words, CSX usually retains employees who erred as Ziparo did. On this record of disparate treatment, we can hardly be certain that CSX would have terminated Ziparo had he not repeatedly made safety complaints. *Contrast Greatwide Dedicated Transp. II, LLC v. U.S. Dep't of Lab.*, 72 F.4th 544, 559 (4th Cir. 2023) (rejecting employer's affirmative defense where there was no evidence that similarly situated employees "faced immediate termination or other disciplinary measures"), *and Fresquez v. BNSF Ry. Co.*, 52 F.4th 1280, 1307–08 (10th Cir. 2022) (rejecting FRSA affirmative defense when employer did not show consistent application of stand-alone dismissible policy), *with Kuduk*, 768 F.3d at 793 (defendant proved its affirmative defense by presenting "uncontroverted evidence that it consistently enforced [its] policy"). Because CSX took a more severe adverse action against Ziparo, a whistleblower, than against many similarly situated comparators, a jury could conclude that CSX was "looking for a reason to terminate [Ziparo's] employment because [he engaged in protected activity]." *Fresquez*, 52 F.4th at 1310.

CSX insists that courts should "defer to [its] exercise of reasonable judgment and its honest belief that the discipline decision was proper—even if its decision was ultimately incorrect." Appellee's Br. at 50. But we do not defer

to an employer at step two of the AIR-21 burden-shifting framework, which places the burden by clear-and-convincing evidence *on CSX* to affirmatively demonstrate that it would have fired Ziparo had he not engaged in protected activity. *Murray*, 601 U.S. at 38–39. What is more, by invoking judicial deference to its business judgment, CSX begs the question—deference is, of course, appropriate *only if* an employer's exercise of its business judgment is lawful. *See Weiss v. JPMorgan Chase & Co.*, 332 F. App'x 659, 663 (2d Cir. 2009) (summary order) ("An employer's invocation of the business judgment rule does not insulate its decisions from all scrutiny. . . ."). And the way that AIR-21 determines the lawfulness of an employer's actions is, at step two, by asking whether CSX would have retained an otherwise identical employee who had not engaged in protected activity. We conclude that no such deference is appropriate where the record indicates that CSX inconsistently terminates employees for similar misconduct.

We conclude that whether CSX unlawfully retaliated against Ziparo is a jury question. If a jury finds that Ziparo has met his prima facie burden of demonstrating, by a preponderance of the evidence, a causal connection between his protected activity and his termination, the jury must then evaluate whether

CSX has met its burden of showing by clear-and-convincing evidence that it would have terminated Ziparo had he not engaged in protected activity.

## CONCLUSION

Based on the foregoing, we conclude that CSX is not entitled to summary judgment on Ziparo's FRSA retaliation claim. The judgment of the district court is therefore **VACATED**, and this case is **REMANDED** for further proceedings consistent with this opinion.